## NATIONAL LABOR RELATIONS BOARD v. ARTHUR WINER, Inc.

### No. 10498.

United States Court of Appeals
Seventh Circuit.

Feb. 26, 1952.

David P. Findling, Associate Gen. Counsel, Nancy M. Sherman, George J. Bott, General Counsel, A. Norman Somers, Asst. Gen., Counsel, and Frederick U. Reel, Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Maurice A. Riskind, Donald J. Yellon, and Jacob M. Shapiro, all of Chicago, Ill., D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., of counsel, for respondent.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This cause comes before this court on petition of the National Labor Relations

Board, as authorized by § 10(e) of the Labor Management Relations Act, 29 U.S. C.A. § 141, et seq., for enforcement of its order directed to the respondent, Arthur Winer, Inc., to cease and desist from certain unfair labor practices in violation of § 8(a) (1) and § 8(a) (3) of the Act. The Board had charged and found that, in violation of these two sections of the Act, the respondent had interfered with, restrained and coerced its employees in their organizational rights and had discharged two of its employees on account of their membership in and activities on behalf of the Amalgamated Clothing Workers of America, hereinafter referred to as the "union."

The trial examiner found that, beginning in 1945, the union had each year made unsuccessful attempts to organize the Winer employees. In June 1949 the organizers for the union started another organizational drive, at first by making phone calls and later by making personal calls at the homes of the employees. At that time there were about seventy-five employees on the respondent's pay roll. About September 1, 1949, the union organizer, Robert Hardy, mailed individual notices to the Winer employees calling a union meeting on September 6th. About fifteen of the respondent's employees, including Helen Little and Hazel Munyon, attended the meeting and participated in the short discussion which followed Hardy's explanatory talk about the union. Within a short time after this meeting two of the respondent's employees, Little and Munyon, were discharged.

### Interference, Restraint and Coercion

On the charge of interference, restraint and coercion, the trial examiner found that Arthur Winer, president of the respondent company, in the latter part of July or the first part of August, called three different employees to his office and, among other things, interrogated them about any dissatisfaction among the employees and as to "what was going on"; that such questioning was in effect " ' * * * interrogation of its employees about their union activities, was so understood by the employees and violated Section 8(1) of the Act'." The trial examiner also found that a question by Winer to one of these employees, Eva Van Meter, as to "how the girls felt about the union," and to another, Katherine Romansky, as to "what the union had to offer," were also violative of the Act. It is conceded, however, that in his conversation with Van Meter, Winer also said: "As I understand it, you are trying to organize a union. If that is what the girls want that is what they can have." Van Meter testified that there had been a slowdown since the company had moved to its new plant and that "something was wrong"; that most of her conversation with Winer was on the question of what was causing the trouble; that they decided that a machine was not properly placed for the best work; and that the moving of this machine, shortly after her conversation with Winer, helped to speed up the work. There was no testimony indicating that Winer asked any of the girls he interviewed whether or not they or any other employees belonged to the union or had engaged in any union activities. Van Meter testified positively that Winer did not ask her such questions. The third girl did not remember his asking anything about dissatisfaction or any similar matter.

Romansky testified that in her talk with Winer he said that he "was trying to make it better for the girls so that they could have two weeks vacation." The trial examiner did not believe Winer's denial that he made this statement and found that "under the circumstances it was made, * * * (it was) an offer of benefit for the purpose of influencing the employees' concerted activities and also violated Section 8(a) (1) of the Act." Yet, in this same report, the trial examiner also found facts from which he concluded that "the General Counsel has failed to establish by a preponderance of the evidence that respondent had knowledge of the union activity of its employees at the time the 1949 vacation policy was fully effectuated and executed." The trial examiner could not reasonably have concluded otherwise since the 1949 two-week vacation period had been taken and the employees had been paid therefor prior to the time Winer talked to Romansky and the other two em-

ployees and prior to the time Winer could have had any knowledge of any union activity in the plant. Moreover, the statement about two weeks vacation was never directly, or by intimation, connected with any suggestion that this was on condition that the girls refrain from union activities. In view of these facts there was no reasonable basis for the inference drawn by the trial examiner and approved by the Board that Winer offered the employees the benefit of two weeks vacation on their abstaining from union activities.

Just prior to the union meeting which was held on September 6, 1949, discussions concerning the union became prevalent among the Winer employees. At noon on the day of the meeting one of the employees, Anne Kusmierz, went to the desk of Anne Winkler, the sewing room supervisor, and, showed Winkler a copy of the letter calling the union meeting and Kusmierz said to Winkler: "Well, I don't know what to do, if I should go to the meeting or shouldn't go." Kusmierz testified that Winkler replied: "Well, you are your own boss. It is up to you. If you want to, you can go and find out what it is all about." The trial examiner found that later in the day Winkler told Kusmierz: "If you go, find out what is going on, what they are offering, things like that," and also asked Kusmierz to call her when she got home from the meeting; that after the meeting Kusmierz did call Winkler and, upon questioning by Winkler, gave detailed information about what took place at the meeting and who attended. The trial examiner found "that Winkler's request for and acceptance of a report on the union meeting constituted surveillance of its employees' union activities in violation of Section 8(a) (1) of the Act." The Board approved this finding. The trial examiner also found that Winkler asked several other employees if they intended to attend the meeting and asked Romansky what she "would get out of the union."

■ While we seriously question whether there was sufficient evidence to sustain many of the findings of the trial examiner and the Board on the question of coercion, we are of the opinion that the facts found, if accepted as true, fall far short of justifying the conclusions of the trial examiner and the Board that the respondent's actions constituted such interference, restraint and coercion of its employees as is prohibited by § 8(a) (1) of the Act.

■ There was no finding that there was any statement derogatory of the union made by the respondent or by anyone speaking for it. We find in this record no finding by the Board that the respondent made any threats against employees in reference to union membership or activity. There was no finding that the respondent promised any benefits except as to vacations and as to that finding, as we pointed out above, there was no reasonable basis for it in the evidence. In Sax v. N. L. R. B., 7 Cir., 171 F.2d 769, 772–773, this court said of questioning of employees similar to the questioning we find in the instant case, at page 773: "Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1)."

And again in John S. Barnes Corporation v. N. L. R. B., 7 Cir., 190 F.2d 127, 130, this court said: "However, the courts have not considered isolated remarks or questions, which did not in themselves contain threats or promises, and where there was no pattern or background of union hostility, as coercion of the employees and as a violation of § 8(a) (1)." See also N. L. R. B. v. Montgomery Ward, 2 Cir., 192 F.2d 160, 163, and Pittsburgh Steamship Co. v. N. L. R. B., 6 Cir., 180 F.2d 731, 735.

■ In the instant case, as in the Barnes case, a small plant with less than one hundred employees is involved. The trial examiner found that during the period in question "union discussions among the employees became quite prevalent in the plant." It is also apparent that the employees talked freely before and with the supervisor, Winkler, and with the company president, Winer. Thus Kusmierz of-

fered information to Winkler and asked Winkler's advice about attending the union meeting. In such a situation, with no anti-union background nor pattern of conduct hostile to unions, the questions and remarks of Winkler and Winer cannot be considered as violations of the Act.

Nor could the trial examiner and the Board reasonably find, in view of the general relations existing between the respondent and its employees as shown by the undisputed evidence and the findings, that Winkler's request for and acceptance of a report on the union meeting constituted surveillance of the employees' union activities in violation of § 8(a) (1) of the Act. The request for and acceptance of this information in itself contained neither a threat nor a promise. It was never found nor shown that Winkler's inquiry resulted from any plan or program of the respondent. So far as the record shows, Winkler was motivated only by her own curiosity on the subject of the union, a subject in which all were interested and about which all of the employees were talking. Against this background Winkler's request for and her acceptance of information cannot be considered as such spying on union activities as would coerce the other employees in violation of § 8(a) (1) of the Act.

The decisions emphasized by the Board as sustaining its position on this question present an entirely different factual picture from the situation we find in the instant case. In N. L. R. B. v. Sunbeam Electric Mfg. Co., 7 Cir., 133 F.2d 856, 858, the executive officers of the company "entered upon a vigorous campaign among its employees to make sure the election went against the union." As a part of this campaign the vice president of the company in an address to the employees accused the union of being dominated by Communists and said that it was not qualified to represent the employees. He then told the employees the details of a general wage increase which the company was planning. A little later the president of the company made a speech to the employees in which he "belittled the efforts of the union" and told the employees "not to be misled by promises, that that was all the union could give them." These were only a few of the instances which in the opinion of the Board and of this court made a pattern of anti-union hostility. In N. L. R. B. v. William Davies Co., Inc., 7 Cir., 135 F.2d 179, 181, the hostility of the company towards the union was apparent and was made known to the employees in thinly veiled threats. In N. L. R. B. v. Electric City Dyeing Co., 3 Cir., 178 F.2d 980, the president of the company made a speech to all of the employees in which he coerced, intimidated and gave promise of benefit as part of his opposition to a union program. This was in addition to other threats and hostile actions. In N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, and in N. L. R. B. v. La Salle Steel Co., 7 Cir., 178 F.2d 829, our examination and consideration of the entire record in each of those cases convinced us that there was a general pattern and plan of anti-union hostility justifying the Board in finding that the particular words and acts complained of were coercive. We find no such justification for the Board's decision in the instant case.

The remaining question presented is whether there was substantial evidence in the record considered as a whole to support the Board's finding that the respondent discharged Little and Munyon because of their union membership and activities in violation of § 8(a) (1) and § 8(a) (3) of the Act.

## The Discharge of Hazel Munyon

As to the discharge of Hazel Munyon, the trial examiner found that for a year prior to Munyon's discharge, Leslie Reicher, her immediate supervisor, had been asking Winer to replace one of the two girls in his department with a man so that he, Reicher would not be required to leave his work to help lift materials to the cutting table, which work was too heavy for a girl to perform. Virgil Dawson, who was hired to replace Munyon, had applied to Winer for a position several months before he was finally hired to replace Munyon. When he first applied, Dawson, who was then working for another clothing manu-

facturer, was told by Winer that he (Winer) did not want to hire the employee of another manufacturer, but that if Dawson ever quit the other company and Winer had anything open at that time, Winer would hire him. Thereafter Reicher continued to press Winer to hire a man, making about a dozen such requests. On Friday, September 9, 1949, (This was the date found by the trial examiner although the evidence indicates the correct date was September 2nd.) Winer hired Dawson at a slight increase in salary over the amount Dawson was receiving from the other manufacturer, and at that time arrangements were made for Dawson to start work on Monday, September 19th. On Saturday, September 17th, ·Munyon was discharged without notice by Winer's assistant, Miss Fresh, who explained to Munyon that her services were no longer required, that the work was too heavy for her, and that a man had been hired to replace her. There was some conflict in the testimony as to what was said about another position being available to or desired by Munyon but she was not rehired by the respondent. Reicher's testimony was undisputed to the effect that after Munyon was replaced by Dawson the production in that department of the respondent's plant was increased fifteen to twenty per cent. However, the trial examiner concluded that even if the change had been contemplated in good faith and that its economic value had been proved, he still was convinced that "in view of the entire record and its revelation of respondent's union animus and illegal conduct," Winer had discharged Munyon because of her union activities. This conclusion was approved by the Board.

■ Our consideration of the entire record convinces us that there is no substantial evidence in the record from which such a finding and conclusion could reasonably be drawn. It seems perfectly clear that from the standpoint of the respondent the replacement of Munyon with Dawson was simply good business. The repondent insists that the replacement was made for that reason. We are confronted here with a question of fact as to the purpose and intention of the respondent's officers. Munyon is ·described in the Board's brief as being one of the two "most active participants in the union meeting." Actually, according to undisputed testimony, Munyon was one of fourteen or fifteen employees who attended the meeting. She was one of the several attending who asked a few questions after the talk by the union organizer. The Board is not permitted to substitute its guess, unsupported by evidence, for the declared purpose, intention or reason of the employer, and to thus convict the employer of an unfair labor practice.

### The Discharge of Helen Little

Helen Little was discharged on September 9, 1949, three days after the union meeting. Just prior to the union meeting Winkler asked her if she was going to the meeting and Little replied: "Absolutely, I am going to that meeting—I would like to know what the union has to offer the girls." Winkler then said, "Yes, I would go if I was you." At the same time Winkler told Little that Winer had told some of the girls that "he didn't care if the girls had a union in the shop." Little did attend the union meeting and asked questions about rates on different materials but she testified that Anne Kusmierz, an employee who was not discharged, asked more questions than any of the other girls at the meeting.

When Little was discharged she was told by Miss Fresh, Winer's assistant, "Helen, we feel that you are very dissatisfied with your work, and we don't like to keep people here that are dissatisfied. We got a report from Chicago saying that you burned out the bearings on your machine." Little testified that she then said to Miss Fresh, "Are you sure that you are laying me off on account of my machine, or are you thinking that I may be a union instigator?"

In his intermediate report the trial examiner stated that the respondent insisted that the sole reason for Little's discharge was its concern over the repair expense

caused by failures in Little's machine due to her failure to oil it properly, and that at the time of Little's discharge the respondent had no knowledge of Little's union activity.

On the question as to the failures of her machine, Little testified that on September 9, 1949, Winer and Winkler came to her machine and, that in answer to their question as to how her machine was acting, Little told them that "as usual" she was having trouble with it. She was then working on an extra machine, her regular machine having been sent to Chicago for repairs. Little did say that she had never been told that she had burned the bearings out on her machine or that she was not oiling it properly. However, Winkler testified that she was told by Henry Trinkle, the plant mechanic, in the presence of Little, that Little had to oil her machine or she couldn't keep the bearings in it. Little did admit that Trinkle had instructed her on how to oil the machine and that "several times" he had to take her machine out for repairs. Winer testified that Trinkle indicated that he spent half of his time working on Little's machine and that she had burned out four sets of bearings because she did not oil the machine properly. Apparently the machines being used by Little were the only ones with which the respondent had such trouble. Winer also testified that when he took Little's regular machine to Chicago for repairs one mechanic indicated that the trouble with the machine was caused by its not being properly oiled. Another man with the same company thought the trouble with the machine was that it had been run at too great a speed and at Winer's request he wrote a letter to Winer saying that this was the cause of the trouble. The speed of the machine apparently was not controlled by the operator. Winer testified that from what Trinkle and the two men at the Chicago factory had told him he decided that Little had not been properly oiling her machine and that he ordered Fresh to discharge Little. Winkler testified that Winer told her that "he wasn't going to have machines repaired and then have the girls

negligent about oiling them," and that he said "he was going to let her (Little) go."

Here we have undisputed testimony that Little, more than any of the other girls in the plant, was having trouble with her machine, trouble which necessitated repeated and costly repairs. We have conflicting evidence as to whether the trouble was caused by Little's failure to oil her machine properly or by the speed at which the machine was being operated. Winer said he believed it was the fault of Little and for that reason he discharged her. The actual cause of the machine failures is not important. The only important question involved here is the question of what Winer believed to be the cause. There was no positive evidence to contradict Winer's statement that he believed the failures of the machines were due to Little's failure to oil them properly.

Nor was there an express finding that Winer knew of Little's membership and activity in the union at the time he ordered her discharged. The respondent contends that Winer did not then know of Little's union activity. The trial examiner waved this contention aside with the statement that, "On the record herein it is obvious that this contention is without merit." It is obvious to us that the trial examiner in arriving at this conclusion and the finding that Little was discharged because of her union activity was depending on a record or a pattern of anti-union hostility which, as we held above, did not exist.

While there was some conflicting evidence as to the details concerning Little's discharge, that is understandable in view of the fact that the parties were testifying from memory as to conversations and events that had taken place almost a year before the testimony was given. It is clear, however, that Little did join the union; that she did attend the September 6th meeting; that she did talk to some of the other girls in the plant about the union; that she did announce to Winkler that she was going to attend the union meeting; and that she did ask some questions at that meeting. These same facts were also true

as to several other employees who were not discharged. On the other hand, it is equally clear that Little did have a great deal of trouble with the machine she was using in her work; that her troubles with the machine caused machine failures which entailed costly repairs; and that the other employees did not have similar troubles with their machines. Moreover, Little herself told her friends that she was discharged because of machine trouble, and told the Indiana compensation authorities that she was laid off because of lack of work. The trouble Little was having with her machine furnished a reasonable ground for discharging her. Miss Fresh told Little at the time of her discharge that the reason for her discharge was that they felt that she was dissatisfied with her work and that she had burned out the bearings in her machine. It would be reasonable for the supervisors and officers of the respondent to feel that, because of all the machine trouble Little was having, she was dissatisfied with her work.

Counsel for the Board stresses the fact at the time she was discharged Little said to Fresh: "Are you sure that you are laying me off on account of my machine, or are you thinking that I may be a union instigator?" This question shows very clearly that Little then understood that the assigned reason for her discharge was the trouble she had been having with her machine. Her question as to the effect of her union activity on her discharge, proved only that there was that question in her mind.

■ We are convinced from our investigation and consideration of the entire record in this case that there was no substantial evidence from which the Board could reasonably find that Little's discharge was because of her union membership and activity rather than her repeated troubles with her machine. The Board, therefore, had no reasonable basis for finding that Little's discharge was a violation of § 8(a) (1) and § 8(a) (3) of the Act.

The petition of the Board for enforcement of its order is denied.