**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JOHN S. SWIFT COMPANY, Inc., Respondent.**

**No. 12855.**

United States Court of Appeals
Seventh Circuit.

May 2, 1960.

Thomas J. McDermott, Associate Gen. Counsel, Hans J. Lehmann, Atty., Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., for petitioner.

John H. Doesburg, Jr., Chicago, Ill., for respondent.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and MERCER, District Judge.

CASTLE, Circuit Judge.

This case is before the Court upon the petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(e)) for enforcement of its order issued against John S. Swift Company, Inc., respondent. The Board's decision and order are reported at 124 N.L.R.B. Number 46.

The Board found that the Company violated Section 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 5), by refusing to furnish wage and classification data required by the Union,[1] and a breakdown as to the cost of the Company's existing health and welfare plan in the certified unit; that the Company violated Section 8(a) (3) and (1) of the Act by discharging employee Andrew Poch because of his union activities, and by discharging five other employees on March 12, 1957 because they refused to cross a picket line established to protest the lawful discharge of several other employees; and violated Section 8(a) (1) by unlawfully interrogating a prospective employee as to whether he was a union member or had any desire to join a union.

1. Local No. 4, Amalgamated Lithographers of America, AFL–CIO.

The Board's order required the Company to furnish the Union upon request with information regarding wages and apprentice or journeyman status of the employees in the unit, and further with information concerning the existing health and welfare program, including the cost to the Company of the existing benefits under the program paid to the employees in the unit; to offer reinstatement with back pay to Poch; upon application to reinstate the five employees discharged on March 12, 1957, to their former or equivalent positions and to place on a preferential hiring list those employees for whom no employment is available; to cease interrogating applicants concerning union membership or activities in a manner violating Section 8(a) (1); and to post appropriate notices.

The contested issues are:

1. Whether substantial evidence supports the Board's finding that the Company refused to bargain in good faith, in violation of Section 8(a) (5) of the Act, by refusing to furnish the Union with pertinent information as to wages and classifications and as to the cost of the Company's health and welfare plan.

2. Whether substantial evidence supports the Board's finding that the Company discriminatorily discharged employee Poch in violation of Section 8(a) (3) and (1) of the Act.

3. Whether the Board properly held that the Company's discharge of five employees because of their refusal to cross the picket line violated Section 8(a) (3) and (1) of the Act.

4. Whether the Board properly found that the Company violated Section 8(a) (1) of the Act by requiring the disclosure by a job applicant of his union affiliation and attitude.

On June 1, 1956, the Board certified the Union as the collective bargaining agent for all lithographic production employees in the Company's Chicago plant. That unit comprises only a portion of the employees at the Chicago plant; the Company also maintains plants in other cities. The Company and the Union engaged in various bargaining sessions between July 1956 and February 1957 without, however, reaching agreement as to a collective labor contract.

The Union at negotiating meetings on August 3 and October 1, 1956, requested that the Company furnish it with a list of the names of all employees in the unit, the wages of each employee, the classification of each employee as journeyman or apprentice, and if classified as an apprentice the time credit the firm considered due to him. Jones, vice-president and general manager of the Company promised on August 3, to provide this information but it was never furnished.

One of the Union's bargaining demands was the institution of its own health and welfare plan for the employees represented by it in the Chicago plant at a weekly cost to the Company of $2 per employee. The Company took the position throughout the negotiations that it would not make any changes in its existing plan covering pensions, life insurance and "health and welfare" benefits applicable to all its plants. At a negotiating meeting on June 30, 1956, the Union requested information concerning the cost of the "health and welfare benefits" for the employees in the unit here involved and was told by Jones that the overall cost of the Company wide program, without separation as to the various benefits or as to the several plants operated by the Company, amounted to $.6006 per hour. The Union's negotiator, Spohnholtz, asked for a breakdown indicating the cost of the health and welfare program alone but Jones claimed he could not give it to him, that "it was all one ball of wax", and was all contained in the 60 cents figure.

The Union repeated its request for information on the cost of the health and welfare plan at the next bargaining meeting on September 17, but to no avail. Jones merely promised to relay the request to the Company's president, Swift. Spohnholtz made another effort to obtain the requested information at an October 5, meeting. On February 20, 1957, Jones called Spohnholtz, promised to pro-

cure certain data on the health and welfare plan, and told him that the Company auditor was preparing them. However, on February 25, Jones informed Spohnholtz that he had the figures on the cost of the plan but could not "break it down". The Company never furnished information to the Union as to the cost of the health and welfare plan.

Andrew Poch was a member of the Union negotiating committee. Poch worked in the stripping department of the Company from April 1954 until his summary discharge on January 3, 1957. His department head, Brogni, considered him a very good workman. The Company gave Poch a $10 weekly merit wage increase about three months before his dismissal, and admittedly never had any complaints about his work prior to January 2, 1957.

On that day Douglas Arrick, a cameraman who worked in another room than Poch, voluntarily reported to Swift and Jones that Poch was responsible for certain marred negatives. Arrick then showed certain damaged negatives to Swift and Jones on Poch's working table, after Poch had left the plant.

On January 3, Poch was called to the office and was charged by Jones with having "deliberately damaged certain work in process". Poch flatly denied the accusation but was fired by Jones. On the same day Jones indicated to Arrick that Poch's discharge had been ordered by President Swift. He added "that's not the way to solve the problem", and that the Union would have another man in the plant who was just as "strong" as Poch.

On February 23, 1957, in a conversation with Spohnholtz, Jones reaffirmed the Company's position that it would not agree to any change in its health and welfare plan. The following day the employees in the unit held a meeting during their lunch hour, and agreed not to work any overtime "to show the Company that they were serious about wanting a union contract," and to obtain more security because of firings that had been taking place. Jones was informed of this decision.

On the morning of March 11, Jones had the Company's supervisors ask the employees in the lithographic production department to work overtime that night. Each of 20 employees who was asked on the morning of March 11 refused and shortly before quitting time repeated such refusal when asked personally by Swift and Jones. Jones thereupon read them a prepared statement to the effect that they were discharged. Each employee was then handed his check and left the building. The Board found that the discharges were for just cause.

Employees Heidenbluth and Tarczynski, who were pressmen's helpers, had not been asked to work overtime on that day. When they were approached by Jones and Swift with the prepared discharge statement, they indicated that they were not union members and disassociated themselves from the refusal to work overtime on that day. President Swift thereupon told them to report for work on the next day. The Company had not ordered overtime on March 11 for three other employees, Goranson, an engraver, and Bennett and Jurewicz, who worked in the art department, and no attempt was made to read the discharge statement to them.

On the following morning, March 12, the discharged employees set up a picket line around the Company's plant. When Heidenbluth and Tarczynski came to work they decided not to cross the picket line and entered the plant to inform Jones of their decision. Jones tried to persuade them to change their minds and when he was not successful, told them to return in half an hour to pick up their checks. Goranson similarly went into the plant on that morning and informed Swift and Jones that he would not cross the picket line. He was then told by President Swift: "Well then you are through—Mr. Jones give him his check". The Board found that these three employees were unlawfully discharged on that occasion for engaging in a strike or concerted activity.

Employees Bennett and Jurewicz had joined the Union on March 9, 1957. They

were not asked to work overtime but upon seeing the picket line, they went to Jones and told him that they had joined the Union. Jones replied, "All right, the girl will give you your checks." Jones then walked away and the two employees were given their final pay checks.

■ The information requested concerning wages and classifications and as to the cost of the company's health and welfare benefits was relevant to subject matter within the sphere of the Union's function as bargaining representative. In this connection we pointed out in J. I. Case Co. v. N. L. R. B., 7 Cir., 253 F.2d 149, 152 that:

"Although the particular circumstances in each case must be considered in determining whether or not the statutory obligation to bargain in good faith has been met (N. L. R. B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 153, 76 S.Ct. 753, 100 L.Ed. 1027), there are numerous decisions to the effect that a refusal by an employer to supply pertinent and relevant wage data concerning wage rates of the employees is a violation of the obligation to bargain in good faith. N. L. R. B. v. F. W. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed. 2d 235, reversing 9 Cir., 1956, 235 F.2d 319; Taylor Forge & Pipe Co. v. N. L. R. B., 1956, 7 Cir., 234 F.2d 227; certiorari denied, 1956, 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238; Boston Herald-Traveler Corp. v. N. L. R. B., 1955, 1 Cir., 223 F.2d 58; N. L. R. B. v. Item Company, 1955, 5 Cir., 220 F.2d 956; N. L. R. B. v. Whitin Machine Works, 1954, 4 Cir., 217 F.2d 593; N. L. R. B. v. Otis Elevator Co., 1953, 2 Cir., 208 F.2d 176."

■ The information sought was pertinent to unresolved issues concerning the ratio of apprentices to journeymen and participation in the Union's health and welfare fund. These matters were the subject of current negotiations. Therefore the company's contention that the wage and classification data was not then needed because wage rates had been agreed upon but no collective bargaining agreement was yet in force and the information not yet needed for the purpose of policing application of the wage clause, is without merit. And from a review of the record it is apparent that although the company had not expressly refused to furnish the information on the health and welfare benefits costs there was substantial evidence to support the Board's finding that the company "made no reasonably diligent effort to obtain it". The Company's inaction spoke louder than its words. We are of the opinion the Board's conclusion that the respondent Company violated Section 8(a) (5) and (1) by refusing to furnish requested wage and classification data and breakdown as to the cost of its existing health and welfare plan is amply supported by the record.

■ The record, however, does not sustain the Board's conclusion that Poch was discriminatorily discharged because of his union activities. The only important thing here is whether the Company believed that Poch spoiled the negatives and discharged him for that cause —not whether he actually spoiled the negatives. N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370, 375. Jones' statement to the effect that Poch's discharge was not the "way to solve the problem" and that the Union would have another man as "strong" as Poch is as much an indication of a belief by Jones that the Union's restlessness was causing a spoilage campaign which other members would carry on after Poch left as it is of a declaration that Poch's union activities were the cause of his dismissal. The situation in this respect is almost identical to that presented in N. L. R. B. v. Kaye, 7 Cir., 272 F.2d 112, 114 where in reversing a Board finding that a discharge was for union activities we said:

"The finding is based upon a dubious inference, in face of direct and positive evidence to the contrary. In this connection, it is pertinent to note that there is no proof

of any anti-union bias or activity on the part of respondent. It has been held, and we think properly, that inferences contrary to direct testimony are not ordinarily sufficient to support a finding. See N. L. R. B. v. Fox Mfg. Co., 5 Cir., 238 F.2d 211, 214, and cases therein cited and discussed. See also N. L. R. B. v. Pittsburgh Steamship Co., 340 U.S. 498, 502, 71 S.Ct. 453, 95 L.Ed. 479. Moreover, it seems unreal to attribute to respondent a discriminatory and therefore unlawful motive in the discharge of Hentz when a non-discriminatory and therefore lawful reason existed. See Miller Electric Mfg. Co. v. N. L. R. B., 7 Cir., 265 F.2d 225, 226. The indulgence of such an assumption casts a serious reflection not only upon the intelligence of respondent's managing official but upon his common sense. This there is no occasion to do.

"Although hardly necessary, we add that Kaye had a lawful basis for the discharge of Hentz if he acted on information that Hentz was engaged in the slowing of production, even though such information was incorrect. See N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370, 375. The Examiner so admits and states in his report, " * * * if Respondent, in fact discharged Hentz for believing that he interfered with production, it would not be unlawful even if Respondent's belief in regard thereto was incorrect."

 Substantial evidence supports the finding that the five employees who the Board found were discharged for refusing to cross the picket line were actually discharged by the Company. The question remains whether in refusing to cross the picket line these employees were engaged in an activity protected by the act. None of these five employees had been asked to work overtime or refused to do so. When they came to the plant on March 12th they found that the employees who had been discharged for refusal to work overtime were picketing the plant. There is no question but what the Company's discharge of the employees who had been asked to work overtime, but who had refused, was lawful. C. G. Conn, Ltd. v. N. L. R. B., 7 Cir., 108 F.2d 390. It is argued that the employees who respected the picket line were not protected by the statute because the pickets were protesting the discharge of and seeking reinstatement of employees discharged for cause. But protest of a lawful discharge is a protected activity. Time-O-Matic, Inc., v. N. L. R. B., 7 Cir., 264 F.2d 96, 98, 102. And employees who go on strike to protest a lawful discharge enjoy statutory protection as economic strikers. N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 193 F.2d 748, 750. See also N. L. R. B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902 and N. L. R. B. v. J. I. Case Co., 8 Cir., 198 F.2d 919. The evidence sustains the Board's findings that the respondent discharged the five employees for their failure to cross the picket line and the Board properly concluded that the discharges were unlawful.

 The record discloses that at the time of the interrogation of Chmielowski as to union membership or attitude there was no anti-union background nor was it associated with or a part of a pattern or course of conduct hostile to unionism. In fact another employee who came to work about the same time was similarly questioned and advised that union membership "wouldn't make any difference". In our opinion the evidence does not support the Board's conclusion that Chmielowski's interrogation violated Sec. 8(a) (1) of the Act. The rationale of our decisions in N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370 and Sax v. N. L. R. B., 7 Cir., 171 F.2d 769 is applicable to this feature of the case.

In view of the foregoing enforcement of the Board's order is denied insofar as it relates to violations of the Act

predicated upon the discharge of Poch and the interrogation of Chmielowski.

It is ordered that in other respects the Board's order be enforced.

Enforcement ordered in part and denied in part.