**INDIANA RAYON CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

No. 15048.

United States Court of Appeals
Seventh Circuit.

Jan. 26, 1966.

**536**

Clyde L. Peterson, James S. Haramy, William E. Plane, Indianapolis, Ind., Cadick, Burns, Duck & Neighbours, Indianapolis, Ind., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott C. Lichtman, and Elliot Moore, Attys., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, for respondent.

Before HASTINGS, Chief Judge, and KNOCH and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

Indiana Rayon Corporation (Rayon), a clothing manufacturer located in Greenfield, Indiana, has petitioned this court to set aside and deny enforcement of the decisions and orders of the National Labor Relations Board (Board) finding that Rayon had violated § 8(a) (1) and § 8(a) (5)[1] of the Labor Management Relations Act.[2]

In March, 1962, the Kentuckiana Joint Board, Amalgamated Clothing Workers of America, AFL–CIO (Amalgamated) began to organize Rayon's employees. On July 21, 1962, Amalgamated notified Rayon that it represented a majority of Rayon's employees and that it was prepared to prove its majority with a card check. It requested a meeting in order to enter into contract negotiations. Rayon's vice-president,[3] S. A. Rosenfield, responded, setting a tentative meeting date and notifying Amalgamated that Rayon would meet with it to discuss its claim of majority status.

Before the meeting, however, Rayon conferred with its attorneys. After consultation, Rayon's attorneys notified Amalgamated that the company had no reason to believe that Amalgamated represented a majority of Rayon's employees and that the tentative meeting was postponed.

On August 2, 1962, Amalgamated filed a petition for certification with the Board. On August 20, the parties joined in a stipulation for a consent election. The election was held and Amalgamated lost by a substantial margin. Amalgamated filed objections, with the result that on November 26 the Board set aside the election and ordered a second election. On December 4, unfair labor practice charges were filed against Rayon for its conduct preceding the first election. On February 28, 1963, Amalgamated requested the withdrawal of its petition for a second election. This was approved with prejudice.

After a full hearing on the unfair labor practices complaint, the trial examiner recommended that the complaint be dismissed. The Board, however, reversed the trial examiner and found that Rayon had violated § 8(a) (1) of the Act by requesting employees to attend and report concerning union meetings; had separately violated § 8(a) (1) by interfering with, restraining, and coercing its employees in the exercise of their rights guaranteed by § 7 of the Act through an election campaign letter and speech by

1. "It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\* \* \*
(5) to refuse to bargain collectively with the representatives of his employees \* \* \*." 29 U.S.C.A. §§ 158(a) (1), (a) (5).

2. The Board's decision and order is reported at 151 NLRB No. 5 and its supplemental decision and order at 151 NLRB No. 132.

3. The trial examiner and the Board refer to Rosenfield as being Rayon's president. The petitioner, who is in a position to know, refers to him as vice-president. Accordingly, we shall refer to him as vice-president.

Rosenfield; and had violated § 8(a) (5) and § 8(a) (1) of the Act by refusing to bargain in good faith with Amalgamated as the representative of its employees in the appropriate unit.

## I

According to a stipulation between the parties, Floyd R. Beitman was a supervisor within the meaning of the Act from the last week in July, 1962 until he left Rayon in 1963.

The complaint alleges that on August 14, 1962 Beitman solicited employees to spy on and report the union activities of fellow employees. At the hearing before the trial examiner, two employees, Mrs. Nellie Ziglar and Miss Earlene Cottrell, testified that Beitman had done roughly what the complaint alleged. By affidavit, Beitman stated that he did not request any employee eligible to vote in the election to attend any union meeting in order to spy or in order to report to him what had transpired.

The trial examiner found the testimony of Mrs. Ziglar too vague and insubstantial to sustain the general counsel's burden of proof on the charge. However, he did find the testimony of Miss Cottrell clear and direct. Nevertheless, he also found that Miss Cottrell's testimony did not specify when the alleged incident occurred and that, therefore, the general counsel had failed to meet his burden of proving by a preponderance of the evidence that the incident occurred within the required statutory time limit of 6 months before the filing of the charge.[4] The trial examiner concluded his discussion of Miss Cottrell's testimony with the statement that the evidence lacked the necessary weight to cause a finding of an unfair labor practice.

The Board disagreed with the trial examiner's assessment of the testimony. It found Mrs. Ziglar's testimony clear enough to support the general counsel's contentions. It also found that since the

unfair labor practice charges were filed on December 4, 1962 (thus making June 4, 1962 the appropriate date of statutory limitation), since the talk between Beitman and Miss Cottrell occurred "possibly" two or three weeks prior to the election date of August 29, and since Beitman was personnel director (a supervisor within the meaning of the Act) only from the last week of July, 1962, the incident Miss Cottrell testified to must have occurred within the period of statutory limitation.

We are bound to uphold the decision of the Board if supported by substantial evidence on the record as whole. 29 U.S.C.A. § 160(f).

The trial examiner's findings and remarks are a part of such record, and the fact that the trial examiner has of necessity assessed the credibility of witnesses may be taken into account in assessing the substantiality of the Board's supporting evidence. Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Porter County Farm Bureau Coop. Ass'n. Inc., 7 Cir., 314 F.2d 133, 144 (1963).

In failing to find a violation of the Act under the surveillance charge, the trial examiner specifically remarked that the testimony of Mrs. Ziglar was vague and not probative enough to sustain the general counsel's burden. In view of the trail examiner's credibility determination and finding, and our similar assessment of the record, we hold the Board's finding with respect to the testimony of Mrs. Ziglar is not supported by substantial evidence on the record as a whole.

The same examination of the record, however, discloses that the Board's inference that the incidents reported by Miss Cottrell occurred within the required six month statutory period prior to the filing of charges is correct. But

---

4. " * * * no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 29 U.S.C.A. § 160(b).

the content and circumstances of the conversations between Miss Cottrell and Beitman, as reported by Miss Cottrell, show only that Beitman sought to find out whether the union was making any proposals or promises with which he was not familiar. He did not seek to discover who attended the meeting nor which employees belonged to the union; nor did he express any hostility to the union. The conversations between Beitman and Miss Cottrell do not appear to have taken place in an official atmosphere nor to have been calculated to impress employees. The conversations appear neither to have been intimidating nor intended to be so.

On the slight evidence presented by Miss Cottrell, Beitman's request for information cannot be considered to be coercive surveillance violative of § 8(a)(1) of the Act. National Labor Relations Board v. Arthur Winer, 7 Cir., 194 F.2d 370, 373 (1952), cert. den., 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638 (1952); cf. Sax v. National Labor Relations Board, 7 Cir.,

171 F.2d 769, 772–773 (1948). As the trial examiner found, the testimony of Miss Cottrell is not of sufficient weight to cause the finding of an unfair labor practice. We hold that it does not constitute substantial evidence that Rayon sought to interfere with, restrain, or coerce employees in the exercise of § 7 rights.

## II

On August 27, 1962, two days before the election, Rosenfield, the company vice-president, mailed a letter to each of Rayon's employees. On the day before the election, he gave a speech to his assembled employees. Rayon alleged that some of his statements were designed to correct misleading or deceptive statements of the union regarding employee rights in the event of plant relocation.

The trial examiner found neither the letter nor the speech violative of the Act. The Board disagreed and set out, with its own emphasis, the following relevant parts, respectively, of the letter and the speech, set out in the margin herein.[5]

5. *(The letter.)*

"The simple fact that there are more than twice as many people such as yourself now employed at Indiana Rayon than there were eight or nine years ago is proof of what our working together has meant to you and the many families like yourself in this area who would otherwise probably not be working in or near Greenfield. * * *. We think it is important for you to know that under Federal law when a union calls a strike among employees over wages or other money matters, and if the employer decides to continue his operation in the struck plant to satisfy and keep his customers, and is, therefore, forced to hire new employees to permanently take the place of those on strike, those striking employees forever lose their right to come back to work for that employer. * * *.

" * * *. *We promise you—and I think we're in a position to know—that there is absolutely no difference in rates of pay and fringe benefits which can be available to you at Indiana Rayon with a union from those which are available to you without a union.*

" * * * *

"Think Carefully about the matters which we have pointed out, keeping in

mind that *the Company cannot and will not do any more for you with a union than it has done and will do without a union.*"

*(The speech.)*

"Since the last time we had an election, some nine years ago, this company is now more than twice as big. Now, the vast majority of our competitors are in the South. How then, with the wages paid there, as compared to what we are paid, does it happen that we are over twice as big as we were, and the highest paid! For the same reason we are standing here today—because those people, *nine years ago,* made this a better place to work in,—because they were determined to give the best to America's children. *And, if anyone is standing here nine years from today, it will be because of our determination tomorrow.*

"*The very fact we are in crowded conditions,* considering expansion, here or elsewhere, whichever is best for the company, *is because of that determination.*

"This is the American Free Competitive System. This is our only right to exist. This is what will make this company greater, this community greater and this country greater—not any promise of

The Board assessed the letter and speech as set out in the margin herein.[6]

It is admitted that Amalgamated's propaganda literature distributed during the three weeks preceding the election contained false and misleading statements concerning plant relocation and the holding in a cited decision by the Sixth Circuit.

It is relevant to point out that on the day before and the day of Rosenfield's speech, Rayon's attorney, Clyde Peterson, spoke to assembled groups of employees. Peterson told the employees of the misstatements contained in Amalgamated's propaganda literature and advised them of the true facts. He also correctly advised them of the statutory responsibilities of each party to bargain in good faith. The hearing examiner found these remarks to be noncoercive and the Board did not overturn this finding. The remarks by Peterson were substantially contemporaneous with those of Rosenfield and we believe reflect the impressions conveyed by Rosenfield.

The most that can be said of Rosenfield's letter and speech, whether read in entirety or read in excerpt, is that, in the circumstances surrounding them in this case, they expressed sentimental beliefs and were somewhat paternalistic; and paternalistic without a big stick.

■■ An employer may express himself freely on labor matters as long as his statements do not contain threats of reprisal or force or promise of benefit. 29 U.S.C.A. § 158(c). Cf. Sax v. National Labor Relations Board, supra, at 772–773. Such inferences as appear in the letter and the speech are little more than rhetoric and do not reach the plane of threat or promise. The Board's inferences are scholastic and, we hold, are not supported by substantial evidence.

III

The Board, once again overruling the trial examiner, found that on the date of the union's demand for recognition, it represented a majority of Rayon's employees. Having made that basic finding, it further found that Rayon violated § 8(a) (5) of the Act by refusing to bargain with a majority union.

At the hearing before the trial examiner, Rayon, in support of its position that its refusal to recognize and bargain with the union was made in good faith, presented the following evidence. After the union's demand, Rayon questioned all

---

mine, certainly not the promise of any paid Union Organizer, *but our promise, each and everyone of us, to our children tomorrow.*

"It was suggested that I be sure and call your attention to the deceptive presentation of facts by the Union *in our ability to relocate this plant.* * * *."

6. "By this letter and speech, the Respondent effectively conveyed to its employees the impression that continued employment was linked to their rejection of the Union in the forthcoming election and that the Union could do nothing to improve their working conditions because the Respondent would give employees absolutely nothing more with the Union than without the Union. Repeated reference to the election results nine years ago was clearly designed to impress upon employees that rejection of the Union in the past was the chief reason for their continued and prosperous employment and that voting in favor of the Union would seriously jeopardize their positions with the Respondent. Respondent's stress upon its ability to relocate the plan could only serve to heighten such fears.

" * * *. Respondent did not merely seek to correct the Union's 'deceptive' statements. It chose, also to emphasize its ability to relocate the plant. Taken in the context of other remarks, conveying Respondent's view that the plant would not now exist had the employees voted for a union 9 years ago, that employees were now about to make 'our promise to our children tomorrow,' that it would be futile for employees to select the Union with the expectation that it could help improve wages and working conditions, together with the absences of any remarks designed to allay the prevailing apprehension over the possibility of plant relocation, the reminder of Respondent's ability to 'relocate the plant' could only serve as an implied threat to employees clearly violative of 8(a) (1) that their selection of the Union would probably result in the loss of their jobs."

of its production supervisors and was advised by them that they did not believe that the union represented a majority. Two trusted employees told Rayon's production manager that they did not believe the union represented a majority. In addition, one of the employees gave the company some grounds to believe that the union's claim was wholly false. Beyond this, Rayon joined in insuring that an election could be had as quickly as possible under customary election procedures. Amalgamated lost the first election and withdrew its request for the second.

Although this evidence of good-faith may be less than overwhelming, the Board, in rejecting the trial examiner's conclusion, cited no contrary evidence whatsoever, but instead engaged in sophistry. Because the Board concluded that Rayon was guilty of the § 8(a) (1) violations discussed above, it reasoned that Rayon was unwilling to permit the question concerning representation to be resolved in a fair election. From this conclusion, it reasoned back that Rayon's refusal to bargain was not made in good faith, but in order to gain time in which to dissipate the union majority.

Such evidence as the Board has presented in support of its finding of § 8(a) (5) violation has been created out of its own findings of § 8(a) (1) violations. This self-supporting scaffolding of unfair labor practice findings must all fall together, for the record as a whole does not support the Board's conclusion. There is no substantial evidence that Rayon's refusal to bargain was not a good faith refusal stemming from its disbelief in the union's majority status.

Subsequent to the filing by Rayon of the instant petition for review, the Board issued a supplemental decision and order on March 30, 1965 relating to the number of valid union authorization cards Amalgamated had obtained. It found that two cards objected to by Rayon should be counted. This brought the total for Amalgamated to 121 cards, with 119 needed for a majority on July 23, 1962, the date of the union demand for recognition.

We have examined the record relating to cards objected to by Rayon. Although we entertain serious doubt that Amalgamated represented a majority of the employees, we need not reach and decide that question here.

Based on our careful review of the record as a whole, the petition to review and set aside the Board's orders in the instant case will be granted and the Board's petition for enforcement is denied.

Orders set aside.

Enforcement denied.