FIRST NATIONAL BANK OF OMAHA,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 19356.

United States Court of Appeals
Eighth Circuit.

July 22, 1969.

Rehearing Denied Aug. 26, 1969.

Clifton L. Elliott and Harry L. Browne, Kansas City, Mo., for petitioner, William E. Morrow, Jr., Omaha, Neb., was on the brief with Clifton L. Elliott, and Harry L. Browne.

Robert E. Williams, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., and Frank H. Itkin, Atty., N.L.R.B., were on the brief.

Before GIBSON, LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The First National Bank of Omaha requests this Court to review and set aside an order of the National Labor Relations Board reported at 171 N.L.R.B. No. 152, 69 L.R.R.M. 1103 (1968). We find that there is substantial evidence on the record as a whole to support the Board's finding that five employees of the bank were discharged in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1). We enforce the order of the Board.

The five discharged employees worked with ten other employees on the day shift in the Proof and Transit Department. They processed and transmitted checks for deposit to the bank's account with the Federal Reserve System. The bank pursued the policy of processing checks on the day they were presented for payment. This policy resulted in employees being required to work overtime on frequent occasions and was a constant source of dissatisfaction among them.

On September 12, 1967, fourteen or fifteen of the Transit Department employees held a meeting in the ladies' restroom during the afternoon coffee break to discuss the overtime problem. They selected the senior employee as their spokesman. After some discussion, the employees agreed that they would present their grievance to the supervisor of the department. The employees then went as a group to the supervisor's desk and told him that they were unhappy about the long hours. They suggested that the bank get an additional proof machine or hire more dependable night help. One of the employees stated that they were going to walk off the job at 6:00 P.M. that day.

The supervisor acknowledged that the hours were bad, and that the night shift was inadequate. He stated that it would take time to hire additional help. He made it plain that the bank would not purchase another proof machine. The meeting ended with the supervisor agreeing to take the employees' complaint to the Director of Personnel and report back to them that afternoon. He did so and called the women together about 5:15 P.M. He told them that the bank was taking steps to hire additional personnel, but that it would be three or four weeks before improvements could be seen. He informed the women that they would have to work until 7:00 P.M. that evening and asked for volunteers to work late.

Five of the fifteen employees walked off the job between 6:00 and 7:00 P.M.

The five reported for work the next morning. They were met by their supervisor who informed them that the bank considered that they had quit their jobs by walking out. They were further informed that they would not be taken back to work.

The employees who stayed on the job and helped process the unfinished work were given a $50 bonus for their "help and loyalty."

The Board found that the bank violated § 8(a) (1) of the Act by discharging the five operators for walking out on September 12th. It issued the usual cease and desist order. It required the bank to offer reinstatement to the discharged employees, to make them whole from loss of earnings and to post appropriate notices.

 The bank contended before the Board, and contends here, that the five employees were not engaged in protected activity because: (1) the walkout was a partial strike and constituted an attempt by the women to work on terms and conditions of employment prescribed solely by them and creating a situation of neither strike nor work; (2) it was a strike by a minority of five (of fifteen) employees in derogation of the action of the majority and was thus unprotected; and (3) the unreasonable and precipitous nature of the walkout, and the potential of the peculiar and unique harm to the bank, renders the employees subject to disciplinary action.[1]

*(1) The walkout was protected activity.*

 The Trial Examiner's statement of the applicable law with respect to the protected nature of the walkout is a correct one:

"Employees may seek to change any term or condition of their employment and their ultimate sanction is the strike. If they choose to strike over hours of work, their strike is no different in quality or essence than is a

---

1. We find no merit in this contention. See, N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 229, 83 S.Ct. 1139, 10 L. Ed.2d 308 n. 8 (1963) ; N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 14, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) ; N. L. R. B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 344, 58 S.Ct. 904, 82 L.Ed. 1381 (1938) ; N. L. R. B. v. Plastilite Corp., 375 F.2d 343 (8th Cir. 1967) ; National Labor Relations Board v. Solo Cup Company, 237 F.2d 521, 526 (8th Cir. 1956) ; National Labor Relations Bd. v. J. I. Case Co., Etc., 198 F.2d 919 (8th Cir. 1952), cert. denied, 345 U.S. 917, 73 S.Ct. 729 (1953) ; and Carter Carburetor Corp. v. National Labor R. Board, 140 F.2d 714, 718 (8th Cir. 1944).

strike over any other term of employment. What may make such a work stoppage unprotected is exactly what makes any work stoppage unprotected, that is, the refusal or failure of the employee to assume the status of strikers, with its consequent loss of pay and risk of being replaced. Employees who choose to withhold their services because of a dispute over scheduled hours may properly be required to do so by striking unequivocally. They may not simultaneously walk off their jobs but retain the benefits of working.

" * * * A work stoppage does not lose its presumptive protection merely because it is limited in duration. If employees have not been replaced while they were away from work, they must be reinstated when they offered to return. * * *"

See, N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099 (1962); Electromec Design and Development Company v. N.L.R.B., 409 F.2d 631 (9th Cir. 1969); Salt River Valley Waters Users' Ass'n v. National Lab. Rel. Bd., 206 F.2d 325, 328 (9th Cir. 1953); National Labor Relations Bd. v. J. I. Case Co., Etc., 198 F.2d 919, 922 (8th Cir. 1952), cert denied, 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351 (1953); Modern Motors v. National Labor Relations Board, 198 F.2d 925 (8th Cir. 1952).

■ While there is some evidence in the record indicating that the strike was a partial one and that the girls intended to walk off the job again if their overtime demands were not met, the record as a whole supports the Examiner's finding to the contrary. In this regard, we note that the bank did not consider the employees' action as being a mere refusal to work overtime. This is demonstrated by the fact that when the employees returned to work the morning after the strike, they were informed by their supervisor that the bank considered that they had quit their jobs.

The bank relies on National Labor Rel. Board v. Mt. Clemens Pottery Co., 147 F.2d 262, 267 (6th Cir. 1945); C. G. Conn, Limited v. National Labor Relations Board, 108 F.2d 390 (7th Cir. 1939); ahd John S. Swift Co., 124 N.L.R.B. No. 46, 44 L.R.R.M. 1389 (1959), enf'd in part, 277 F.2d 641 (7th Cir. 1960), to support its view that the employee walkout was unprotected. We believe that its reliance is misplaced.[2] While each case lends some support to the bank's view, we do not view any of them as being controlling here. In each case, the Board or the Court determined that the employees had not assumed the status of strikers—that they intended to continue to work their regular hours but refused to work overtime.

In *Mt. Clemens Pottery*, five employees were discharged for refusing to work overtime and leaving their jobs before the close of the work day. The Board found that all five had clearly indicated their unwillingness to continue working under the terms prescribed by the employer. It also found that when the employees returned to work the following morning, the employer had reason to believe that they would again engage in like activity.

In *Conn*, employees walked off the job before they had completed an overtime assignment. They returned to work the next morning. They were asked later that day to indicate in writing whether they would work overtime in the future. Those who refused to sign were laid off indefinitely. The Court also found that there was evidence indicating that the

2. The bank also relies on Home Beneficial Life Ins. Co. v. National Labor Rel. Bd., 159 F.2d 280 (4th Cir.), cert. denied, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344 (1947), and National Labor Relations Bd. v. Montgomery Ward & Co., 157 F.2d 486 (8th Cir. 1946), to support its view. Neither, in our view, does so.

In *Home Beneficial Life Ins. Co.*, the employee insurance agents refused to report to their offices daily as they were required to do.

In *Montgomery Ward*, the employees remained on their job but refused to handle clerical work originating from a struck plant of their employer.

employees intended to do the same thing each day until their demands were met.

In *Swift*, the employees met and agreed that they would not work any overtime. They were subsequently requested to do so and refused. The request was repeated and again refused. The employees did not walk off the job. The employees were then discharged and told that they would be considered for reemployment when they agreed to comply with orders.[3]

The bank appears to take the position that the Act never protects employees who walk off the job during working hours if the walkout is related to the performance of overtime work. It argues that the inevitable result of protecting such walkouts would be to permit employees to impose their own hours of work on an employer.

 We recognize the difficulty of drawing a line between protected and unprotected activity in such situations. The task is even more difficult when the walkout occurs at or near the end of a regular day, and the employees return to work the next morning. The line is one which must nevertheless be drawn. Employees have the same right to engage in concerted activity to bring about a change in overtime policy as they do to bring about a change in wages or other working conditions. They have as much right to strike on this issue as any other, and they are not required to institute the strike at any particular time of the day or to maintain it for any particular period of time to be entitled to the protection of the Act. The test in each case is whether the employees have assumed the status of strikers. They cannot continue to work the regular hours of employment and refuse to work overtime.

The Board has drawn the line here and, in our view, it has used the proper standards in doing so. There is substantial evidence in the record to support its findings.

 The bank criticizes the Board for indicating that the bank had a responsibility to seek assurances of the employees that the illegal activity would not continue prior to discharging them. While such an inquiry might have satisfied the bank as to the employees' future intent or shed light on their past actions (Such inquiry was made in *Conn* and *Swift*.), the bank was under no obligation to make such an inquiry.

 The burden of proving that the walkout was protected rested with the General Counsel and was not shifted by the failure of the bank to inquire. We are convinced that he sustained this burden.

 If the bank had acted immediately after the walkout to replace the striking employees with other employees, it could have done so legally. The employees were "economic strikers" and entitled to reinstatement only if their jobs were open when they returned to work. Here, the employees offered to come back to work before their jobs were filled and the bank was obligated to take them back.

(2) *The strike was not unprotected as a minority one.*

The bank asserts that the fifteen employees of the Transit and Proof Department met and agreed to a course of action, that course being to make a demand, to give the bank a reasonable

---

3. The Board, in John S. Swift Co., 124 N.L.R.B. No. 46, 44 L.R.R.M. 1389, 1390 (1959), stated:
"\* \* \* It is quite clear that the Respondent's intention was to order them, under pain of discharge, to work overtime, and the employees could not have understood it otherwise in the context of the statement which was read at the time of their termination. The employees' refusal to work over-

time on March 11 constituted an attempt to work on terms prescribed solely by themselves. The Board and the courts have squarely held that such a refusal to work provides the employer with valid ground for discharge. \* \* \*" (Footnote omitted.)
The Board's order on other aspects of the case was enforced in N. L. R. B. v. John S. Swift Company, 277 F.2d 641 (7th Cir. 1960).

time to satisfy it and to take more drastic action only if the bank failed to take corrective steps. It argues that under these circumstances, the walkout by the five employees before the bank could take corrective action was a minority strike and thus unprotected. It cites N. L.R.B. v. Sunbeam Lighting Company, 318 F.2d 661 (7th Cir. 1963); Plasti-Line, Incorporated v. N.L.R.B., 278 F.2d 482 (6th Cir. 1960); and National Labor Relations Board v. Draper Corporation, 145 F.2d 199, 156 A.L.R. 989 (4th Cir. 1944), in support of its position.

■ We do not believe that the record supports the bank's view of the evidence. At most, it shows that the fifteen employees met in the lunchroom, selected a spokesman, and decided to meet with their immediate supervisor to present an overtime grievance to him. Neither the selected spokesman nor anyone else was authorized to bargain for the group or to bind it to a settlement. There is no evidence of any understanding by the employees that they would individually or collectively withhold action until the bank had an opportunity to work out the solution to the overtime problem. Nor is there evidence to support the view that a majority of the women felt that they had made progress at the meeting with the supervisor. In-

deed, one of the bank's witnesses (one of the women who remained on the job) testified that she talked with the other girls after the meetings and they all felt that, "It was the same old talk. We didn't feel that we accomplished anything."

While the cases cited by the bank lend some support to its position, they are not, in our view, controlling here. In each case, the employees were represented by a labor organization, were covered by a collective bargaining agreement and were in the process of negotiating a new contract when a "wildcat strike" occurred.[4] Here, the employees were unorganized and were not covered by a collective bargaining agreement. While they were united in a desire to improve the overtime situation, no detailed plan had been established for achieving that end.

Even if it were clear that the employees had chosen a spokesman and had agreed on a plan of action, it is not at all clear that the walkout would be an unprotected activity. See, N.L.R.B. v. R. C. Can Company, 328 F.2d 974, 979 (5th Cir. 1964).[5]

The bank's petition to review and set aside the Board's order is denied. The Board's request for enforcement is granted.

4. See, N. L. R. B. v. Tanner Motor Livery, Ltd., 349 F.2d 1, 5, n. 3 (9th Cir. 1965). See also, Gould, The Status of Unauthorized and "Wildcat" Strikes Under the National Labor Relations Act, 52 Cornell L.Q. 672 (1967).

5. In N. L. R. B. v. R. C. Can Company, 328 F.2d 974, 979 (5th Cir. 1964), eight employees out of a total of fifty walked off their jobs in the middle of the day in an effort to put pressure on the company to speed up negotiations with the union that represented the employees.

They did so even though the employees had apparently reached a concensus at a previous union meeting not to walk out "at that time." The Court held that the employee-walkout was protected activity because it sought "to generate support for and acceptance of the demands put forth by the union, * * * the means used [did] not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union such as, for example, a no-strike pledge, a cooling off period, or the like during negotiations. * * *".