**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**CONE BROTHERS CONTRACTING COMPANY, Tampa Sand & Material Company, Florida Prestressed Concrete Co., Inc., Respondents.**

**No. 19577.**

United States Court of Appeals Fifth Circuit.

May 8, 1963.

Rehearing Denied June 29, 1963.

**4**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Atty., Stuart Rothman, Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., for petitioner.

I. Walter Fisher, Raymond C. Muller, Fisher & Phillips, Atlanta, Ga., for respondents.

Before TUTTLE, Chief Judge, WOODBURY,* Chief Judge, and BELL, Circuit Judge.

WOODBURY, Chief Judge.*

The basic question raised by this petition for enforcement of an order of the National Labor Relations Board is whether the evidence in the record considered as a whole is sufficient to support the Board's decision that one of the respondents, Tampa Sand & Material Company, had violated § 8(a) (1) and (3) of the National Labor Relations Act, as amended.

---

* Chief Judge, First Circuit, sitting by designation.

The three respondents are Florida corporations with headquarters in Tampa. Cone Brothers Contracting Company is engaged primarily in building streets, highways and bridges and in doing excavation work in Tampa and elsewhere in the State. Florida Prestressed Concrete Co., Inc., confines its operations to the manufacture of prestressed and precast cement products at a single plant located on the outskirts of Tampa. Tampa Sand & Material Company, with which we are primarily concerned in this proceeding, is engaged in the production and distribution of ready-mix concrete, concrete block, sand, shell and crushed stone. It has four locations in or on the periphery of Tampa called "batch bins," that is to say, plants from which its concrete mixer trucks are loaded and dispatched. Its principal bin and main office is located in the city and is known as its "13th Street bin." Three other bins are strategically located on the outskirts of the city. Its Anderson Road bin is to the northwest, its bin at the juncture of Routes 301 and 60, called its 301–60 bin, is to the southeast and its Skipper Road bin is to the northeast.

The respondents concede that the three corporations are closely affiliated in ownership, control and management and do a substantial amount of business with one another. The Board's finding that they constitute a single employer within the meaning of the Act goes unchallenged. When appropriate they will be referred to hereinafter in the singular.

The Board's findings and order cover a wide range of unfair labor practices by Cone Brothers and Tampa Sand. Pursuant to stipulation, however, we are concerned on this petition for enforcement with only the part of the order having to do with the Board's conclusion that Tampa Sand discharged three truck drivers in violation of § 8(a) (1) and (3) of the Act and that a strike which began the day after the discharges was in consequence thereof and hence an unfair labor practice strike warranting the Board's order to reinstate the strikers with back pay.

The respondent was having labor troubles early in 1960. There was unrest among its employees, some of whom wanted to unionize and some of whom did not, and its managerial and supervisory employees in one way or another exhibited no little anti-union animus. The record is clear as to this. No more need be said by way of background.[1]

The events with which we are here directly concerned took place toward the end of May, 1960. On May 24 the Board, acting on a representation petition filed in March by Teamsters, Chauffeurs, Helpers Local Union No. 79, ordered a representation election on June 7 by a unit of Tampa Sand's employees including its truck drivers. And on the same day, May 24, employees of Cone Brothers and Florida Prestressed went out on strike under the leadership of Local 925, International Union of Operating Engineers, AFL–CIO, which was the Board-certified bargaining representative of Cone Brothers' maintenance employees and was conducting a campaign to organize other employees of Cone Brothers and the employees of Florida Prestressed. The Board found that there can be no doubt that picket lines were established at the premises of these two employers.

1. The respondent moved to strike that portion of the Board's brief in which under the heading "Background" it recounted the labor troubles of Cone Brothers and Tampa Sand, which, it said, were eliminated from the case by the stipulation, were not conceded and "incorrectly and prejudiciously represented Respondent's position." The material in the Board's brief to which the respondent objects summarizes the findings of the trial examiner adopted by the Board. Having agreed that, apart from the excepted findings, the Board's order "is valid and proper," the validity of the findings on which those parts of the order rest is at least inferentially conceded. The respondent does not need to fear that the collective mind of the court will be poisoned by statements of factual background in the Board's brief. We shall decide this case on the material printed in the record. The respondent's motion is denied.

**6**

But there is no direct finding as to whether or not the premises of Tampa Sand were also picketed and the evidence one way or the other is conflicting. A witness for the respondent said all of Tampa Sand's premises were picketed on May 24, but the Board witnesses said only that pickets in front of Cone Brothers' premises adjoining Tampa Sand's 13th Street and 301–60 bins occasionally wandered by those bins on that day and the day following. At any rate, Tampa Sand employees apparently worked as usual on May 24 and 25.

On the afternoon of May 25 Tampa Sand's general manager called the dispatcher on duty at the 13th Street bin and ordered a truck driver working out of that location named Stringfellow, who was active on behalf of the Teamsters Union, to report with his truck the first thing next morning for work at Florida Prestressed. It was routine for Tampa Sand's general manager to direct the dispatcher at the 13th Street bin to assign trucks to work at Florida Prestressed. Tampa Sand's trucks were often assigned to such work and all orders for the delivery of ready-mix concrete were customarily handled by the dispatcher on duty at the central 13th Street bin. It was unusual, however, for the general manager to specify a particular driver for specific work. Ordinarily the dispatcher at the 13th Street bin selected the driver for each delivery as ordered on the basis of the suitability of the equipment on hand for the job to be done and picked the bin from which delivery was to be made on the basis of the availability of the bin to the place of delivery.

Evidently the particularity of the general manager's order aroused the dispatchers' suspicion (there were two on duty early the next morning when Stringfellow reported for work), for they told Stringfellow that they were ordered to send him to Florida Prestressed and then, having been told by Stringfellow that he would not cross the picket line there, faked a telephone message calling Stringfellow home to meet a fictional family emergency. Stringfellow having punched out and left, one of the 13th Street dispatchers called the dispatcher at the Skipper Road bin, which was nearer the Florida Prestressed plant, to send a truck to fill the general manager's order. The Skipper Road dispatcher said he had heard of "the little deal" and had already sent driver Otho Mathis to Florida Prestressed. Believing from this that the general manager had ordered two trucks to Florida Prestressed, one from Skipper Road and the other from 13th Street, the dispatchers at the latter location, in order to fill the general manager's order, sent one of their own drivers named Coppola, who, they thought correctly, would not hesitate to cross the picket line. Coppola worked all day at Florida Prestressed.

Mathis from the Skipper Road bin went to Florida Prestressed as ordered but refused to drive his truck through the picket line. He reported his refusal back to his dispatcher at Skipper Road and the dispatcher told him to "stand by," which he did while someone else drove his truck into the Florida Prestressed plant. Later he returned to his Skipper Road station where he was told that his time had been stopped at the general manager's order as of the time he reported his refusal to cross the picket line. In the meantime the general manager ordered another truck sent from Skipper Road to Florida Prestressed and the dispatcher sent driver Wilson. Wilson also refused to cross the picket line, he said for fear of bodily harm to himself and his family, and later the general manager told Wilson that he had "quit" and ordered his time card clocked out. Also in the meantime the general manager had called the dispatcher on duty at 13th Street to inquire why Stringfellow had not gone to Florida Prestressed. When the general manager was told that Stringfellow had received an emergency call to go home, the general manager, evidently suspicious, asked whether Stringfellow got the call before or after he was given his assignment, and the dispatcher falsely answered before. The dispatchers agreed that as union sym-

pathizers the purpose of their subterfuge had been to save Stringfellow his job. Both of them joined the Teamsters Union the same day, May 26.

Also during the morning of May 26 the general manager called the dispatcher at 13th Street for the names and telephone numbers of drivers on lay-off status. He was given the names of several, one of whom, Davis, a known union adherent, he called on the phone and asked to return to work. Davis agreed to report for work at 13th Street at noon but during the morning went to Florida Prestressed where he saw the picket line. When he reported for work the general manager told him he was to work at Florida Prestressed, and when he refused to cross the picket line there the general manager told him that he had refused to work or refused the job, and Davis left.

The Teamsters Union called a meeting of Tampa Sand employees for the evening of May 26, the notice of which read:

"A strike vote will be taken because the Company is now firing our people because of their belief in not crossing a picket line. Therefore, we must stand together and not be picked off one at a time."

The matter stated in the notice was discussed at the meeting with particular reference to the day's events involving drivers Mathis, Wilson and Davis, and a strike was voted 45 to 1. The following day, May 27, pickets appeared at Tampa Sand's locations bearing the legend "UNFAIR LABOR PRACTIC-ES." Nevertheless Tampa Sand continued to operate in spite of a high turnover rate of employees hired to fill the vacancies caused by the strike.

On the basis of the facts briefly outlined above, the Board, affirming the trial examiner, found that Tampa Sand, because of the known union sympathies of Mathis, Wilson and Davis, had "engaged in a scheme" of putting them in a position of either crossing the picket line at Florida Prestressed or "being placed in

a 'quit' status," and, when they refused to cross the picket line, terminating their employment. The Board said that it agreed with the trial examiner that Tampa Sand had thereby "constructively discharged" the three drivers for the purpose of discouraging union membership in violation of § 8(a) (1) and (3) of the Act. And it said: "Moreover, we find that even in the absence of such scheme the discharge of these employees for engaging in the protected activity of concertedly refusing to cross the picket line violated Sections 8(a) (3) and (1) of the Act."

The concept embodied in the term "constructive discharge" is too vague and uncertain in meaning to be helpful. The long and the short of the matter is that Mathis and Wilson lost their jobs and Davis was not rehired, which, in the context of this case as will presently appear, amounts to the same thing. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The fact that the men were discharged[2] by roundabout means and circumlocution, telling them that they had "quit," avails the employer nothing. The question is whether their discharges constituted an unfair labor practice.

This court in N. L. R. B. v. Montag Bros., Inc., 140 F.2d 730 (C.A. 5, 1944), and it would seem also in J. A. Bentley Lumber Co. v. N. L. R. B., 180 F.2d 641 (C.A. 5, 1950), held, but without analysis or discussion, that it was an unfair labor practice for an employer to discharge an employee for refusing to cross a picket line in the course of his work. The Court of Appeals for the Second Circuit, however, in N. L. R. B. v. Rockaway News Supply Co., 197 F.2d 111 (C.A. 2, 1952), one judge dissenting, took a different view. In considering the question whether an employer violated § 8(a) (1) and (3) of the Act by discharging an employee because of his refusal to cross a picket line at the premises of another employer which his duties required him

---

2. For simplicity of statement we can refer to Davis as a dischargee.

to enter, the court said (197 F.2d pp. 113–114):

> "In other words an employee is of course free to exercise his right to refuse to cross a picket line when he is on his own time and his discharge for doing so would doubtless be a violation of Section 8(a) (1). But he is not free to exercise the right during his working time in violation of his employer's working rules by refusing to perform that part of his regular duties which requires him to cross the picket line. To hold otherwise would be to permit an employee unilaterally to dictate the terms of his employment which it is well settled he may not do."

On certiorari the Supreme Court affirmed. N. L. R. B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). But it did not do so on the reasoning of the Court of Appeals but on the basis of its interpretation of an applicable collective bargaining agreement. Indeed, the Court specifically declined the invitation (345 U.S. p. 75, 73 S.Ct. p. 522) to decide "sweeping abstract principles as to the respective rights of employer and employee regarding picket lines." Highest authority, therefore, leaves the question before us open.

■ The facts in the Rockaway News case differ from the facts in the case at bar in that in Rockaway News, as both the Court of Appeals and the Supreme Court were careful to point out, there was no evidence of anti-union animus on the part of the respondent-employer, or anything to indicate that the employee's discharge was intended to or did in fact discriminate against him as a union man or was designed to discourage membership in a labor organization. The facts in the case at bar are quite otherwise, however, for here there is ample evidence of the respondent's strong anti-union bias and prejudice, and there is also ample evidence to indicate that the drivers involved were selected because of the respondent's belief that as union adherents they would show the union man's well known respect for and deep-seated reluctance to cross picket lines, and refuse to do so, thereby giving an excuse to discharge them and thus eliminate votes for the union in the pending representation election. Moreover, while we recognize the respondent's right to attempt to run its business in spite of the sympathetic activities of its drivers, we find no evidence in this case that such was the fact, that is, that the respondent in doing what it did acted only to preserve the efficient operation of its business. For all that appears in the record, other drivers were on duty and available who, like driver Coppola, would have no compunction about crossing the picket line of Florida Prestressed.

■ In short, we think that when it appears that a discharge of an employee for refusing to cross a picket line is resorted to out of anti-union animus to get rid of a union sympathizer and not to preserve the efficient operation of an employer's business, an unfair labor practice in violation of § 8(a) (1) and (3) occurs. See N. L. R. B. v. Montag Bros., Inc., 140 F.2d 730 (C.A. 5, 1944), and perhaps J. A. Bentley Lumber Co. v. N. L. R. B., 180 F.2d 641 (C.A. 5, 1950). See also N. L. R. B. v. John S. Swift Company, 277 F.2d 641, 646 (C.A. 7, 1960).

■ Since it is quite clear that the strike of Tampa Sand's employees of May 27 was voted and called because of the unfair labor practices of the respondent the day before in discharging the three drivers, it follows that the strike was one for unfair labor practices and that therefore under the established rule the strikers as well as the three drivers are entitled to reinstatement with back pay.

A decree will be entered enforcing the order of the Board.