## NATIONAL LABOR RELATIONS BOARD, Petitioner,

### v.

## L. G. EVERIST, INC., Respondent.

### No. 17486.

United States Court of Appeals
Eighth Circuit.

July 23, 1964.

Janet A. Kohn, Atty., N. L. R. B., Washington, D. C., made argument for the petitioner and Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison and Paul Resnik, Attys., N. L. R. B., Washington, D. C., were on the brief.

Curtis L. Roy, of Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., made argument for the respondent and filed brief with Curtis D. Forslund, Minneapolis, Minn., and John Burke, Sioux Falls, S. D.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

VOGEL, Circuit Judge.

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq., has petitioned this court for enforcement of its order of April 23, 1963, corrected on June 7, 1963, following the usual proceedings under § 10 of the Act. The Board's decision and order are reported in 142 N.L.R.B. No. 20. This court has jurisdiction under § 10(e) of the Act. The Board found that respondent had violated § 8(a) (1) of the Act by refusing to reinstate four drivers upon their unconditional application for employment which followed their discharge after they had refused to cross a picket line of another and different union picketing an employer with whom the drivers had no connection. The Board also found that at times other than referred to herein respondent had further violated § 8(a) (1) by creating an impression of surveillance and by threatening employees with loss of their jobs if they supported the union. The second violation of § 8(a) (1) is not in actual dispute here. This controversy surrounds solely the refusal of the employer to reinstate the four drivers. There is little or no dispute in the actual physical facts which we summarize as follows:

L. G. Everist, Inc., the respondent, is engaged in the production, sale and hauling of aggregate and related products. Its drivers were represented at all times material herein by the General Drivers and Workers Union Local 749, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Such union was certified by the Board as the exclusive bargaining representative. In late 1961 respondent contracted with a transportation company to haul aggregate to Jones, Brown and Root Construction Company, prime contractor at a dam construction site near Chamberlain, South Dakota. The construction project was a large one engaging some 550 workers in all.

On Friday, December 8, 1961, the dam construction site was being picketed by the Iron Workers Union which had a dispute with Western Contracting Corporation, one of the other contractors on the job. It was apparent from the sign carried by the picket that only Western and not Jones, Brown and Root, the prime

contractor, was being picketed. The sign read:

"IRON WORKERS NO. 184 ON STRIKE FOR A CONTRACT WESTERN CONTR. CORP. THIS DISPUTE WITH ABOVE CONTRACTOR ONLY"

Respondent's nine truck drivers arrived with their trucks to deliver aggregate to the prime contractor. Upon observing the picket, they parked their trucks and called their union representative, who told them not to cross the picket line. At that time none crossed. Shortly thereafter, however, respondent's superintendent, Earl Roe, arrived and after discussing the situation with the prime contractor instructed respondent's nine drivers to either cross the picket line and make their deliveries or to return their loaded trucks to respondent's place of business. Five of the drivers made their deliveries, thus crossing the picket line. The four involved here—Dunlap, Miller, Taylor and Reeves—refused to do so and returned their loaded trucks to respondent's depot as directed. Later that day upon instructions from Roe they reported to the front office, where Roe gave them their final checks and discharged them.

On Monday, December 11, 1961, respondent resumed deliveries to the construction site, using the five drivers who had crossed the picket line together with three of the respondent's supervisors and a student driver. Later that day, however, work on the construction site ceased because of mechanical difficulties of the prime contractor and operations did not again resume until December 15, 1961. In the meantime, the four alleged discriminatees and three of respondent's other drivers met on Monday evening, December 11th, and decided to strike in protest to the December 8th discharge of the four drivers who refused to cross the picket line. The strike and picketing were maintained until the morning of December 14th, at which time the drivers, including the four who had previously been discharged, abandoned the strike and offered to "return to work immediately". During the entire interim of this strike, work at the construction site had ceased because of the mechanical difficulties of the prime contractor so that apparently any significance which might be attached to the strike was lost or dissipated.

In response to the request to be returned to work, respondent notified the drivers who had crossed the picket line on December 8th and had continued working to report for work the following day. It refused, however, to reinstate the four discharged drivers on the ground that such reemployment after discharge would be a violation of company policy.[1]

Respondent resumed deliveries to the construction site on December 15th, utilizing its five remaining drivers, three supervisors and one other driver. From that time until about Christmas respondent's deliveries were made by the five drivers who were with them originally and who had crossed the picket line, three supervisors and various other employees who were hired during that period. Permanent replacements were hired about Christmas, at which time the three supervisors returned to their normal duties.

The Examiner found that the discharges of December 8, 1961, and respondent's refusal and failure to reinstate Reeves, Taylor, Miller and Dunlap did not violate § 8(a) (3) of the Act since respondent's actions were prompted by its need to continue operations and not in reprisal for the alleged discriminatees having refused to cross the picket line. He recommended that the complaint be dismissed insofar as it alleged violation of § 8(a) (3).

The Board disagreed with the Examiner, and with two members dissenting, found it

"* * * unnecessary to decide whether, as the General Counsel con-

---

1. At the hearing it was stipulated that eventually offers of reinstatement were made to Reeves on August 8, 1962, and to Taylor, Miller and Dunlap on August 9, 1962.

tends, the Respondent unlawfully discharged the claimants on December 8, since in our view, the Respondent violated Section 8(a) (1) of the Act by refusing to reinstate the claimants upon their unconditional application for reinstatement on December 14, at which time they had not been permanently replaced."

The Board then stated that the Trial Examiner, in agreement with the respondent, had misinterpreted Redwing Carriers, Inc., 137 N.L.R.B. No. 1545, aff'd sub nom. Teamsters, Chauffeurs & Helpers Local U. No. 79, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. N. L. R. B., D. C. Cir., 1963, 325 F.2d 1011, as meaning that where an employer lawfully "discharges" an employee for refusing to cross a picket line, such "discharge" is tantamount to a discharge for cause and, as in the case of and discharge for cause, the employer is thereafter entitled to refuse to reinstate the employee for the reason that justified the original discharge. Contrarily, the Board, in noting that Redwing held that an employee's refusal to cross a picket line was protected activity, interpreted it as meaning in effect that:

> " * * * a 'discharge' for refusal to cross a picket line is an exception to the general rule that employees may not be discharged for engaging in protected concerted activity. It is therefore not a discharge for cause, but merely a permissible act in furtherance of the employer's overriding right to keep his business going by replacing such employees. To this extent, at least, the employees involved herein are similar to economic strikers, who may also be replaced by an employer to permit continued operation of the business but who, if not permanently replaced, are entitled to reinstatement upon unconditional application."

The majority of the Board, finding that the four discharged employees had made an unconditional application for reinstatement prior to respondent's hiring of permanent replacements, held that respondent violated § 8(a) (1) of the Act by refusing to reinstate them.

The dissenting members of the Board —Rogers and Leedom—who had also disagreed with the majority of the Board's decision in the original Redwing opinion, stated:

> "Unlike our colleagues of the majority, we would find that the Respondent did not violate the Act by discharging claimants on December 8 and by refusing to reinstate them on December 14. For the reasons stated in the original Board decision in Redwing Carriers, [130 N.L. R.B. 1208; see, also, 137 N.L.R.B. No. 142] we believe that the claimants' refusal to cross the picket line was unprotected activity. We would therefore find that the Respondent acted lawfully in terminating the employment of the claimants because of their refusal to cross the picket line. Since the original discharges were for cause and were therefore lawful, we would further find that the Respondent did not thereafter violate the Act in refusing, for the same reason, to reinstate the claimants."

We are told that this is a case of first impression in an appellate court. The views of three members of the Board who constituted the majority are diametrically opposed to the views of the two dissenting members and the views of the Examiner.

It should probably be emphasized here that the uncontradicted testimony is that the contract between respondent and the prime contractor provided that continued and uninterrupted deliveries were essential; that the aggregate piles were low; that interrupted deliveries could cause respondent to lose its contract; and that at least some of the drivers were informed when they were hired that deliveries could not be interrupted by strikes. The Board, by its decision, did not disturb the Examiner's findings in this regard or that the discharges "were prompted by Respondent's need to con-

tinue operations and were not in reprisal for the claimants having refused to cross the picket line." The Examiner further stated:

> " * * * Having considered the animus and interference, I find that the discharges and the replacement steps were in fact prompted by the need to continue operations, and that the Company did not discriminatorily discharge these employees or unlawfully refuse to reinstate them."

In other words, we do not have involved the same situation with which the Fifth Circuit was concerned in N. L. R. B. v. Cone Brothers Contracting Co., 5 Cir., 1963, 317 F.2d 3 at page 8, certiorari denied 375 U.S. 945, 84 S.Ct. 353, 11 L.Ed. 2d 275, wherein that court stated:

> " * * * when it appears that a discharge of an employee for refusing to cross a picket line is resorted to out of anti-union animus to get rid of a union sympathizer and not to preserve the efficient operation of an employer's business, an unfair labor practice in violation of § 8(a) (1) and (3) occurs. See N. L. R. B. v. Montag Bros., Inc., 140 F.2d 730 (C.A.5, 1944), and perhaps J. A. Bentley Lumber Co. v. N. L. R. B., 180 F.2d 641 (C.A.5, 1950). See also N. L. R. B. v. John S. Swift Company, 277 F.2d 641, 646 (C.A.7, 1960)."

The Board argues here, however, that the respondent violated § 8(a) (1) not in the discharge of the drivers on December 8th but only in its denial of reinstatement to them on December 14th.

If, in considering this case, we accept, without deciding, the contention of the Board that the refusal of an employee to cross a picket line of a union not his own, against an employer with whom he has no connections whatsoever, is protected activity, in that it is an exercise of "the right to * * * assist labor organizations * * * and to engage in other concerted activities for the purpose of * * * mutual aid or protection" guaranteed by § 7 of the Act, as the Court of Appeals for the Second Circuit did in N. L. R. B. v. Rockaway News Supply Co., 2 Cir., 1952, 197 F.2d 111, 113, and as the Supreme Court apparently did in affirming that case in National Labor Relations Board v. Rockaway News Co., 1953, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832, but that the employer, nevertheless, possessed the right, under such circumstances, to continue the orderly and efficient operation of his business by discharging the drivers and replacing them with other employees, then the question in this case must be resolved by the determination of whether the four drivers were *permanently* discharged on December 8th or if by virtue of the fact that they had been engaged in protected activity, their status was more or less one of suspended activity with the right to return to work whenever they so desired so long as the respondent had not permanently replaced them. We have difficulty in following the Board's reasoning that the discharges of December 8th were in reality not discharges at all but constituted "merely a permissible act in furtherance of the employer's overriding right to keep his business going by replacing such employees." The Board would equate such "discharged" employees with economic strikers and hold that they had the right to return to work at any time up until they had been permanently replaced by the respondent. We find no support for the Board's conclusion. In N. L. R. B. v. Rockaway News Supply Co., supra, the respondent had discharged an employee for refusing, in the performance of his duties, to cross a lawful picket line maintained at premises other than his employer's by a union of which he was not a member. The Board directed reinstatement. The Court of Appeals, by a divided court, denied enforcement of the Board's order. In affirming, with three justices dissenting, the Supreme Court stated at page 75 of 345 U.S., 73 S.Ct. at page 522.

> " * * * The actual controversy here is within a very narrow scope,

so narrow that the Board in its opinion said:

> " 'Although Waugh's refusal to cross the picket line was a protected activity, the Respondent, as a normal incident of its right to maintain its operations, could have required Waugh to elect whether to perform all his duties or, as a striker, to vacate his job and make way for his replacement by the Respondent. Instead the Respondent discharged Waugh.'

"The Court of Appeals said * *, 'We cannot follow the Board's reasoning.' Nor can we. *The distinction between discharge and replacement in this context seems to us as unrealistic and unfounded in law as the Court of Appeals found it. This application of the distinction is not sanctioned by National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381. It is not based on any difference in effect upon the employee.* And there is no finding that he was not replaced either by a new employee or by transfer of duties to some nonobjecting employee, as would appear necessary if the respondent were to maintain the operation. Substantive rights and duties in the field of labor-management do not depend on verbal ritual reminiscent of medieval real property law.

> *"In this case there is no finding, evidence or even charge that the dismissal of Waugh resulted from anti-union bias, or was intended to or did discriminate against him to discourage membership in a labor organization."* (Emphasis supplied.)

It is true that the Supreme Court affirmed Rockaway News on the ground that the employee there had violated a written collective bargaining contract between his union and his employer which specifically provided against strikes, walkouts and other cessations of work. 345

U.S. 79, 81, 73 S.Ct. 519, 522. However, we see no difference between the refusal to cross a picket line in violation of such a bargaining contract and the refusal to cross a picket line in violation of the ordinary and implied obligations of employment. The one is written, the other implied. In either situation the business operations of the employer are adversely affected and it is on the basis of such detriment sustained by the employer that the Board justifies the respondent's discharges. It must transfer present employees or hire new ones if it is to continue operations.

" ▇ Here, as in Rockaway News, * * * there is no finding, evidence or even charge that the dismissal of * * * [Dunlap, Miller, Taylor and Reeves] resulted from antiunion bias, or was intended to or did discriminate against * * * [them] to discourage membership in a labor organization." The Examiner found that the four drivers had been "discharged" and such finding was not disturbed by the Board. The discharges were not premised on any other happenstance or occurrence except refusal to work. They were not conditional in any way. The drivers were discharged and the respondent had a policy of not rehiring any employee who had once been discharged. The respondent had a right to the maintenance of such policy and it proceeded, promptly, to replace the discharged drivers with other of their employees who would perform the work expected of them—delivering aggregate to the prime contractor even if it did mean crossing a picket line of another union against another employer. The refusal of the drivers here to cross the picket line was merely sympathetic activity against a third employer with whom the drivers had no connection and with whose union they were not involved. It did not constitute strike activity against their own employer nor the employer to whom they were making deliveries. It had no effect on their own union, their contract or their relationship with their employer. Such refusal was no more and no less than a refusal to

work, a violation of their contract to continue hauling for which they could be and were validly discharged. Such layoff and discharge was a complete severance of the employer-employee relationship and was something which respondent had an absolute right to do so long as its actions were not the result of anti-union bias or intended to discriminate against the employees and to discourage membership in a labor organization. We see no reason in law, in logic or in the provisions of the Act which compels the acceptance of the Board's attempt to equate these drivers with the status of economic strikers and hold that by their refusal to work they might enter into a legal twilight zone from which they could return to work at any time of their own choosing, so long as it was before permanent replacements had been hired. As the Supreme Court said in Rockaway News: "The distinction between discharge and replacement in this context seems to us as unrealistic and unfounded in law as the Court of Appeals found it." (345 U.S. 75, 73 S.Ct. 519) The Board's "special function of applying the general provisions of the Act to the complexities of industrial life" embraces no such power and we do not believe it to be "within the mainstream of its duties".[2]

Enforcement of the Board's order is denied insofar as it is based upon respondent's refusal to reinstate the four drivers. Enforcement of the remainder of the order, which is in reality uncontested, will be granted.

MATTHES, Circuit Judge (dissenting).

The pivotal issue presented by this proceeding, and so recognized by the parties, is whether the refusal of the four employees to cross the picket line constituted protected activity. The majority fails to come to grips with this question but attempts to demonstrate prin-

cipally on the authority of Labor Board v. Rockaway News Co., 345 U.S. 71, 73 S.Ct. 519, that even if it be conceded that the employees engaged in protected activity, nevertheless they were *permanently* discharged on December 8, such discharge was a complete severance of the employer-employee relationship, and respondent's failure to reinstate the employees could provide no basis for an 8 (a) (1) violation.

First, it should be noted that in Rockaway the Supreme Court expressly declined to promulgate any sweeping abstract principles as to the respective rights of employer and employee regarding picket lines. Secondly, while the Supreme Court did not expressly hold that the involved employee had engaged in unprotected activity, it seems to me that this deduction is inescapable because of the Court's holding that the questioned activity of the employee was in violation of the no-strike clause in the labor contract.[1] It was in this context that the Court held that there was no distinction between discharge and replacement.

I would hold that the employees here involved had the right to refuse to cross the picket line, that such refusal was protected activity in that it was the exercise of the right to assist another labor organization and a right guaranteed by Section 7 of the Act. Redwing Carriers, Inc., 137 NLRB 1545, affirmed sub nom. Teamsters, Etc., Local U. No. 79 v. NLRB, D.C.Cir., 325 F.2d 1011. However, as the Board concedes, the right of the employees to engage in this protected activity was not unlimited, and under proper circumstances must yield to the respondent's right to continue the operation of his business. Here, the respondent's overriding right to keep its business in operation provided justification for the course he pursued—but it does not necessarily follow that respondent had the absolute right to refuse to re-

---

2. National Labor Relations Board v. Erie Resistor Corp., 1963, 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308.

1. The Board and Respondent seem to be in agreement that the Supreme Court held that the employee had engaged in unprotected activity.

instate employees upon their timely and unconditional application made before their jobs had been filled with permanent replacements.

I believe that the protected activity here engaged in placed the four employees in a status similar to that of economic strikers. And although economic strikers may be permanently replaced, an employer may not permissibly refuse them reinstatement if they unconditionally apply therefor prior to the time their jobs have been permanently filled. Cf. Labor Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904; N. L. R. B. v. J. Mitchko, Inc., 3 Cir., 284 F.2d 573; N. L. R. B. v. United Brass Works, Inc., 4 Cir., 287 F.2d 689.

In view of what I regard as controlling precedent I am satisfied that under the circumstances presented by this record, the Board properly found that the employees were entitled to reinstatement and that respondent's failure to recognize this right was violative of the Act.

Accordingly, I would grant enforcement of the Board's order in its entirety.