**VIRGINIA STAGE LINES, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 14841.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 1, 1971.

Decided April 15, 1971.

Betty Southard Murphy, Washington, D. C. (Warren Woods, Washington, D. C., on brief) for petitioner.

Eugene B. Granof, Washington, D. C., Attorney (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Michael F. Messitte, Attorney, Washington, D. C., on brief) for respondent.

Before BRYAN, CRAVEN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

This petition for review filed by Virginia Stage Lines, Inc., and a cross-petition for enforcement filed by the National Labor Relations Board arise out of the discharge of two of the company's bus drivers who refused to perform work that might otherwise have been undertaken by drivers striking a commonly owned corporation. We enforce a Board order reinstating the men with back pay.[1]

Virginia Stage Lines, Inc., and Safeway Trails, Inc., are wholly owned subsidiaries of Continental Trailways, Inc., and both, along with other bus companies, operate regularly scheduled and charter buses out of the Trailways Terminal in Washington, D. C. Virginia Stage operates regularly scheduled trips between Washington and points south. Safeway's scheduled routes run between Washington and points north. Both companies have ICC authority to run charter buses in either direction, but both generally concentrate their charter business in the areas served by their scheduled operations.

The division of the charter business is more or less formalized. The director of sales for the Trailways Terminal supervises the booking of all charters out of Washington for all Continental Trailways companies serving the area. He testified that each January the companies' general managers establish a quota of buses available for charter. As a general rule, the terminal's sales director assigns charters north of Washington to Safeway if that company has equipment available. Charters south of Washington are assigned to Virginia Stage until its quota is filled. When Safeway is unable to provide a bus for a northbound charter, the director calls on Virginia Stage to take the run. Conversely, when Virginia Stage cannot take a southern charter, Safeway ordinarily is offered the job. Only when both companies lack equipment does the director contact a non-affiliated bus line.

Although commonly owned, the companies are separately managed and each has its own labor policies. The drivers for Safeway are represented by the United Transportation Union, AFL-CIO. Virginia Stage drivers in the Washing-

1. Virginia Stage Lines, Inc., 132 NLRB No. 107, 74 LRRM 1300 (1970).

ton area, despite frequent organizational efforts, are not unionized. The record, however, discloses no anti-union bias on the part of the company, and its drivers stationed in the western part of Virginia are organized.

In April 1969, Safeway's union drivers began an economic strike which lasted five months causing Safeway to cancel its scheduled runs and sharply curtail its charter operations. Instead of having 30 buses a day available for charter, the number varied from 7 to 12. Although Virginia Stage did not assume any of Safeway's scheduled runs, its northbound charter business appreciably increased during the strike. Safeway's strikers set up picket lines which the Virginia Stage drivers had to cross to get in and out of the Washington terminal and the garage both companies used. Although Virginia Stage's scheduled runs and southern charters continued uninterrupted, some resistance developed to performing the northern charter work which the Safeway strikers regarded as belonging to Safeway.

Two Virginia Stage drivers, Charles Tallent and Richard Loughhead, were supporters of the union. A year before the strike they had made their apartment available for meetings to discuss affiliation with the union, and during the strike, they solicited their fellow employees for a representation election. These activities were not known to the company.[2]

Tallent and Loughhead, who were assigned to the company's extra board, served in rotation with other drivers for charters and as substitutes for scheduled runs. Both willingly drove scheduled runs and southbound charters even though they were required to cross the Safeway drivers' picket lines. They took occasional charter trips north, but as the strike wore on, both, pleading fear of reprisal by the Safeway strikers, refused to accept northbound charters.

Tallent also explained that his refusal to take the northern trips was based in part on his belief that he would be doing work that properly belonged to the Safeway strikers. Both drivers expressed a wish to continue driving to the south. After officials of the company unsuccessfully sought to persuade them to change their views, they were discharged. At least two other drivers protested the northbound charters, but upon threat of discharge they agreed to take the assignments.

Several days after Loughhead's discharge, he notified his supervisor that if other drivers continued to drive north, he would also go. The company, however, refused to reinstate him. Tallent did not apply for reinstatement.

The Board, finding that Tallent and Loughhead refused to drive northbound charters as a direct result of the strikers' picketing activities, held that the two men were engaged in activity protected under § 7 of the Labor Act [29 U.S.C. § 157] by making common cause with the strikers for mutual aid and protection. The Board also found that the company did not hire permanent replacements for either employee. From this, it concluded that the drivers were not discharged on account of the company's need to carry on its business, but because they had engaged in protected concerted activity. Absent clear business necessity, the outright discharge of employees protected under § 7 is, in the Board's view, a violation of § 8(a) (1) [29 U.S.C. § 158(a) (1)], and it ordered the company to reinstate Loughhead with back pay as of the date he offered to return to work and Tallent with back pay as of the end of the Safeway strike.

The company attacks the Board's order on two grounds: first, that Tallent and Loughhead did not engage in protected, concerted activity immunizing them from discharge when they refused to take the northbound trips; and sec-

---

2. The trial examiner, with the subsequent approval of the Board, dismissed a charge that the company discriminated against Loughhead and Tallent because they were active in organizing company drivers. No review is sought on this issue.

ond, that the Board incorrectly determined that Loughhead's offer to return to work was unqualified and that Tallent was not required to apply for reinstatement. In any event, the company says, the men had been permanently replaced.

Section 7 of the Act [29 U.S.C. § 157] guarantees the right of every employee "to form, join or assist labor organizations * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." In NLRB v. Union Carbide Corporation, 440 F.2d 54 (4th Cir. 1971), we held that § 7 protected an employee who refused as a matter of principle to cross a picket line maintained by fellow employees at his employer's place of business even though the striking union was not his bargaining representative.[3] We agreed with the Fifth Circuit that such an employee "has in effect plighted his troth with the strikers, joined in their common cause, and has thus become a striker himself." NLRB v. Southern Greyhound Lines, 426 F.2d 1299, 1301 (5th Cir. 1970); accord, NLRB v. Difco Laboratories, Inc., 427 F.2d 170 (6th Cir. 1970); contra, NLRB v. Illinois Bell Telephone, 189 F.2d 124 (7th Cir.), cert. denied, 342 U.S. 885, 72 S.Ct. 173, 96 L. Ed. 663 (1951).

■ Notwithstanding Virginia Stage's contention that it is a separate employer,[4] the Board was fully justified in applying the law applicable to a common employer. Both companies are commonly owned, operate from a common Washington terminal, and most important—from the standpoint of this case—have well integrated charter businesses. As a comparison of Virginia Stage's charter operations before and after the strike illustrates, the parent company was able to salvage part of Safeway's losses with Virginia Stage's gains and to this extent blunt the impact of the Safeway strike. From May 1, 1968 to June 20, 1968, a year before the strike, Virginia Stage made 21 charter trips north. For a corresponding period during the strike, Virginia Stage's northern charter business increased sixfold, to 130 trips. In our judgment, the Board properly held that Virginia Stage cannot accept benefits of common ownership which enhance its profits from charter operations, and at the same time, claim independence from Safeway with respect to labor controversies involving those same charters.

Virginia Stage asserts that the Board's emphasis on the common characteristics of the companies is contrary to its holding in Transcontinental Bus System, Inc., 178 NLRB 110, 72 LRRM 1214 (1969). That case, however, involved only the determination that the separate corporations of the Transcontinental family were more appropriately suited for separate bargaining units

---

3. Tallent explained that support for the union was one of his reasons for refusing to take the charter trips. Loughhead simply said he was afraid, but his advocacy of the union distinguishes his situation from that of Mullins, the employee who was denied protection in *Union Carbide.* Mullins' refusal to cross the picket line was based "on fear and nothing else." 440 F.2d at 56.

4. The kinship of Virginia Stage and Safeway distinguishes this case from NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), and NLRB v. L. G. Everist, Inc., 334 F.2d 312 (8th Cir. 1964), which did not involve a common employer. Other cases indicate that employees of a neutral employer are protected when they refuse to cross a stranger picket line. See NLRB v. Alamo Express, Inc., 430 F.2d 1032 (5th Cir. 1970); Overnite Transp. Co., 154 NLRB 1271, 60 LRRM 1134 (1965), enf'd sub nom., Truck Drivers and Helpers Local No. 778 v. NLRB, 124 U.S.App.D.C. 289, 364 F.2d 682 (D. C.Cir. 1966). See also NLRB v. L. G. Everist, Inc., *supra,* 334 F.2d at 318 (Judge Matthes dissenting). We express no opinion on this issue. We do note, however, that *Rockaway News* probably was decided on the narrow ground that a no-strike clause had been breached by the discharged employee. See NLRB v. Southern Greyhound Lines, 426 F.2d 1299, 1302 (5th Cir. 1970).

than for a single nationwide unit, and it in no way settled the relationship of commonly owned bus companies for all purposes. Furthermore, it should be noted that identity of bargaining units is of little significance in the context in which Loughhead and Tallent assert their § 7 rights. This is illustrated by both NLRB v. Union Carbide, 440 F.2d 54 (4th Cir. 1971), and NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir. 1970), where employees who refused to cross the picket line were accorded § 7 protection although they were not members of the bargaining unit whose union was on strike.

■ The company, drawing an analogy to the partial strikes held unprotected in Home Beneficial Life Ins. Co. v. NLRB, 159 F.2d 280 (4th Cir.), cert denied, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344 (1947), and NLRB v. Montgomery Ward & Co., 157 F.2d 486 (8th Cir. 1946); contends that Loughhead and Tallent could not refuse to perform some, but not all, of their work.[5] We do not hold, however, that they could engage in a slowdown, or in any way decline to perform all their assigned work and yet remain on the job entitled to their pay. We would find it unexceptionable for the company, if need be, to permanently replace them, or to suspend them until the end of the strike unless they earlier abandoned it. Indeed, the Board expressly recognized that if it were reasonably necessary in carrying on the company's business, Virginia Stage was free to replace the two drivers because they are in effect no more than economic strikers. Cf. NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Redwing Carriers, Inc., 137 NLRB 1545 (1962), enf'd sub nom., Teamsters, etc., Local

Union No. 79, etc. v. NLRB, 117 U.S. App.D.C. 84, 325 F.2d 1011 (1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176 (1964). Substantial evidence, however, supports the Board's finding that the company did not permanently replace either Loughhead or Tallent. Therefore, because of the men's status as economic strikers, the Board could require their reinstatement. Cf. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); NLRB v. Union Carbide Corp., 440 F.2d 54 (4th Cir. 1971); NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir. 1970).

■ Finally, Virginia Stage argues that neither Loughhead nor Tallent made an unconditional offer to return to work, and for that reason are not entitled to reinstatement with back pay. Loughhead told his supervisor that he would accept northbound charters if the rest of the drivers were going to continue to take them. At the time he made this statement, all the other drivers were performing their charter assignments north. The condition was, therefore, fulfilled, and the company had no right to refuse him reinstatement on that ground.

■ Tallent also, by virtue of his status as an economic striker, was entitled to reinstatement. Once he assumed this status, Virginia Stage was not privileged to terminate his employment completely except under circumstances not present in this case. See e. g., Redwing Carriers, Inc., 137 NLRB 1545, 50 LRRM 1440 (1962), enf'd sub nom., Teamsters, Chauffeurs & Helpers Local Union No. 79, etc. v. NLRB, 117 U.S. App.D.C. 84, 325 F.2d 1011 (1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176 (1964); Overnite Transp.

---

5. While the rule against partial strikes is unquestioned, its application to refusals to cross a picket line has been criticized. See Getman, The Protection of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U.Pa.L.Rev. 1195, 1226 n. 133 (1967). In any event, the company's analogy is particularly vul-

nerable because Loughhead and Tallent, who worked only when their names reached the top of the extra board, volunteered to relinquish that position, perform no work, and go to the bottom of the Board without pay when they were assigned to a northbound charter.

Co., 154 NLRB 1271, 60 LRRM 1134 (1965), enf'd sub nom., Truck Drivers and Helpers Local No. 728 v. NLRB, 124 U.S.App.D.C. 289, 364 F.2d 682 (1966). But Tallent was unqualifiedly discharged in violation of his rights. He, therefore had no reason to notify the company at the end of the strike that he was ready for work, and he could properly view an application for reinstatement as a ritualistic act. Since Virginia Stage never afforded him reinstatement, the Board's order was an appropriate remedy well within its statutory power. NLRB v. Southern Greyhound Lines, 426 F.2d 1299, 1303 (5th Cir. 1970).

The petition to review and set aside the order of the National Labor Relations Board is dismissed, and the order of the Board will be enforced.

ALBERT V. BRYAN, Circuit Judge (dissenting):

The majority now completely repudiates our decision in NLRB v. Union Carbide Corporation, 440 F.2d 54 (4 Cir. 1971) by affording Tallent and Loughhead § 7 protection. 29 U.S.C. § 157. There we said:

"One who is afraid to cross a picket line by reason of physical fear makes no common cause, contributes nothing to the mutual aid or protection and does not act on principle. Mullins' [the non-striking-union employee] refusal to cross the picket line was not protected activity under Section 7, and enforcement of the Board's order [of reinstatement] as to him will be denied".

This proposition is the determinant of the controversy here. When they refused to perform their jobs, Tallent and Loughhead unequivocally and repeatedly told the company that fear of hurt or harm actuated them. That this was no mere pretense and there was imminent justification for it, witness:

Non-striking Virginia drivers such as Loughhead and Tallent were threatened by Safeway strikers with damage to their personal safety; cars were destroyed; drivers' wives were harassed by threatening telephone calls; when arriving at the terminal to take a New York charter bus usually run by the striking union, four or five pickets "backed me [Tallent] up against the bus and told me not to go" and if he did, they would "personally tear [his] car up", which was then at the terminal garage, and that they would call New York and "make sure [he] would not return".

Yet these are the persons with whom the Board finds Loughhead and Tallent "plighted their troth, joined in their common cause" and thus became strikers themselves. I cannot imagine substantial evidence casting these two in this character. For me it is utterly unbelievable that they were in truth loyal and devoted confederates, sympathizing with those who were threatening their lives. Nevertheless, it is on this remarkable finding that the Board and the Court give Tallent and Loughhead § 7 protection.

Motivation of the refusals to work must be appraised as of the time they occurred, not in the later cooling days, weeks or months. When it happened Tallent and Loughhead pleaded fear and they ought to know. Their refusals were not hasty determinations. They had studiedly resisted the company's attempts to persuade them to remain as employees. Surely the employer is not to be found in fault because it accepted the persistent word of the dischargees. The endeavor now to avoid *Union Carbide* by playing down the positiveness of their declaration by calling it an "excuse" or no more than momentary timidity, just will not pass muster under the substantial evidence analysis. The recited facts wholly douse it.

Since Loughhead and Tallent were discharged for cause, thereafter they had no mandatory claim on the company for restoration. See *Union Carbide*, supra. Hence, the Board's reinstatement order wilts on analysis.

I would reject the order.