No. 25674.

United States Court of Appeals,
Ninth Circuit.

Feb. 15, 1972.

MONTANA–DAKOTA UTILITIES CO.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
and

System Council U–13, International Brotherhood of Electrical Workers, AFL–CIO, Intervenor.

No. 71–1224.

United States Court of Appeals,
Eighth Circuit.

March 15, 1972.

* J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation.

Dale E. Beihoffer, Faegre & Benson, George D. McClintock, Minneapolis, Minn., for petitioner.

Elliott Moore, Atty., N.L.R.B., Washington, D. C., Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Marjorie S. Gofreed, Atty., N. L.R.B., for respondent.

Before VAN OOSTERHOUT, ROSS and STEPHENSON, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This case is before us upon the application of Montana-Dakota Utilities Co. (hereinafter the Company) to review and set aside an order of the National Labor Relations Board issued on April 19, 1971, reported at 189 NLRB No. 111, and upon the Board's cross-application for the enforcement of its order. The jurisdiction of the Board is not contested; our jurisdiction is established by § 10(e) and (f) of the National Labor Relations Act as amended. The charging party System Council U-13, International Brotherhood of Electrical Workers, AFL-CIO, (hereinafter the Union) has intervened and filed brief in support of the Board's position.

The Board, in agreement with its Trial Examiner with member Kennedy dissenting, found that the Company violated § 8(a)(1) of the Act by suspending eight employees for thirty days by reason of their refusal to cross a peaceful informational picket line set up at the worksite of another employer. The picketing union had no relationship with the union here involved and had no grievance against the petitioner. The Board's order requires the Company to cease and desist from the unfair labor practices found and requires the Company to make whole the eight suspended employees for wages lost for the period from March 4, 1970, (the date the picket line was withdrawn) through March 26, 1970, (the day prior to the reinstatement of the employees) less sums earned in other employment during the period.

The primary issue presented is whether the Board properly determined upon the facts of the case that the Company violated § 8(a)(1) by imposing the thirty-day suspension on the eight employees who refused to cross the picket line to carry out a work order.

It is the contention of the Company that the Union, as the employees' authorized bargaining representative in a bargaining agreement in force at the time here material, contracted away any right the employees might have to refuse to cross the picket line. The basic facts are not in dispute and are fairly set out in the Trial Examiner's opinion.

The Company is a public utility primarily engaged in providing electricity and natural gas to consumers in North and South Dakota, Nebraska and Minnesota. The Union is an association of twelve sister locals representing the Company's employees. The Company

and the Union have a long-established collective bargaining relationship with the bargaining agreement here pertinent covering the period from December 15, 1969, through June 30, 1971. The bargaining contract contains a no-strike clause reading as follows:

"Article III

Public Obligation

*Section 1.* It is recognized that the Company is engaged in public service requiring continuous operation, and it is agreed, in recognition of such obligation of continuous service that, during the term of this Agreement there shall be no collective cessation of work by members of the Union and that the Company will not lock out the employees covered by this Agreement on account of any controversy respecting the provisions of this Agreement. All such controversies shall be handled as provided for herein."

Article IV to the extent material reads:

"*Section 1.* The right to employ, promote, discipline and/or discharge employees and the management of the Company are reserved by and shall be vested in the Company, subject, however, to the full terms of this Agreement."

Article VIII sets out grievance procedure. Article IX provides for compulsory arbitration of disputes which arise "respecting the interpretation, construction, intent or meaning of the provisions of this Agreement, which cannot be settled by mutual agreement as hereinbefore provided."

The no-strike clause in its present form had been incorporated in previous bargaining agreements. During the bargaining leading to the contract here involved the Union proposed a picket line clause reading:

[*"It shall not be a violation of this agreement, and*] it shall not be cause for discharge [*or discipline*] if any employee or employees refuse to go through any authorized picket line of any Union." (Brackets and emphasis added.)

The parties had previously agreed on all other portions of the contract. They were initially unable to agree on the picket line clause. The problem of drafting a mutually agreeable picket line clause was delegated to Union attorney Weinberg and Company attorney Murray. After some negotiations, Weinberg by letter of December 13, 1969, to Murray proposed the picket line clause heretofore set out including the bracketed portion. This was rejected by Murray who by letter proposed that the parts of the proposed picket line clause set out in brackets be deleted. This was agreed to by Weinberg and by the contracting parties and the picket line clause with the portions in brackets omitted was adopted and made a part of the bargaining agreement. Each attorney in the correspondence indicated that by agreeing to the picket line clause they were not waiving any rights of their clients under applicable state or federal law. The Company during the negotiations had consistently expressed a willingness to waive the right to discharge but had persistently refused to waive the right to discipline. The picket line clause must be read in the light of the no-strike and compulsory arbitration provisions previously agreed upon.

The facts leading up to the thirty-day suspension of the eight Company employees who refused to cross the picket line to carry out a work order may be summarized as follows:

Early in 1970 the eight employees here involved were regularly assigned to install underground pipelines to some one hundred homes in a federally subsidized housing project which was being developed by Buckingham Wood Products Company as general contractor in Rapid City, South Dakota. On February 25, 1970, as the eight employees approached the assigned worksite to carry out their work order they encountered a peaceful information picket line set up by West River Building Trades Council. The pickets carried signs which read:

"THIS HOUSING PROJECT IS BEING BUILT BY BUCKINGHAM WOOD PRODUCTS COMPANY UN-

DER SUBSTANDARD WAGES, HOURS AND WORKING CONDITIONS FOR ALL EMPLOYEES."

West River had no relationship whatsoever with the eight employees or the Union representing them. West River had no contract with the Buckingham Wood Products Company nor did it have any dispute with the petitioner. The employees were advised by West River that the picketing was purely informational directed exclusively at Buckingham Wood Products Company.

The eight employees, after refusing to cross the picket line to carry out their work orders, returned to the Company's warehouse for instructions. The Company manager, Lawellin, met with the eight employees and told them it was important for them to return to their assigned work as the completed line would bring in one hundred new gas customers and the Company could not afford to reschedule work every time a picket line was encountered. The Company was advised that the men would not cross the picket line. Later that afternoon Lawellin, after consulting with Company officials, called another meeting with the eight employees. He ordered them to report for the work previously assigned to them at eight o'clock the next morning and told them that if they failed to do so they would be suspended without pay for thirty days. None of the employees reported for work the following day, whereupon each was suspended for thirty days without pay.

On March 3 the pickets were withdrawn. Union Steward McLean advised Lawellin of this and suggested that he might desire to recall the suspended employees the next morning. The employees had not been replaced. The next day Lawellin advised McLean the suspension would remain in effect. When the thirty-days suspension period expired, the eight men were recalled without pay for the suspension period. The unfair labor practice charged was filed on March 9 which led to the Board's order heretofore set out.

We shall assume for the purposes of this case that the employees have a protected right under § 7 of the Act to refuse to cross a peaceful picket line set up by a union in which they have no direct interest. The dispositive issue is whether the Union has contracted away or waived the right to refuse to cross a picket line to carry out a work order. The Board held that the right of the eight employees to refuse to cross the picket line under the undisputed facts was not relinquished by the bargaining agreement. The Company contends that the Union and the employees, by the terms of the bargaining contract, contracted away their right to refuse to carry out a work order when confronted by the informational picket line heretofore described.

█ We hold that under the bargaining contract as a whole, and particularly Articles III, IV, VIII and IX, thereof, the Union and the members which it represents waived any right they might otherwise have had to cease work when confronted by the picket line. The picket line clause is relevant only as a relinquishment by the Company of a right to discharge for the work cessation resulting from the refusal to cross the picket line. The Company has not relinquished its right to impose reasonable discipline on employees refusing to obey the work order under the facts of this case.

█ The rules applicable to the construction of contracts in general apply to bargaining contracts. The contract must be construed as a whole and effect must be given to the mutual intention of the parties. The no-strike clause heretofore quoted recognizes the public obligation of the Company to give continuous service and contains an agreement that "there shall be no collective cessation of work by members of the Union" on account of any controversy respecting the provisions of the agreement, and that such controversies shall be handled as provided in the agreement. The contract sets up grievance procedure and in Article IX provides for binding arbitration with respect to "the interpretation,

construction, intent or meaning of the provisions of this Agreement, which cannot be settled by mutual agreement as hereinbefore provided."

The Union contended that the no-strike, no-lockout clause does not cover the situation where the work stoppage is caused by a refusal to cross an informational picket line established by an unrelated union at a worksite off the employer's premises. The Board upheld such contention. We disagree.

The Supreme Court has frequently endorsed the Congressional policy of favoring settlement of labor disputes through arbitration. The Supreme Court in Steelworkers of America AFL-CIO v. Warrior & Gulf Navigation Co., 363 U. S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, states:

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

In Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America, v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, the Court found that there was no express no-strike clause in the bargaining agreement but nevertheless determined that the union had bargained away its right to strike upon the basis that it had bargained to resolve the dispute by binding arbitration. The Court states:

"The collective bargaining contract expressly imposed upon both parties the duty of submitting the dispute in question to final and binding arbitration. In a consistent course of decisions the Courts of Appeals of at least five Federal Circuits have held that a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement. The National Labor Relations Board has reached the same conclusion. W. L. Mead, Inc., 113 N.L.R.B. 1040. We

approve that doctrine. To hold otherwise would obviously do violence to accepted principles of traditional contract law. Even more in point, a contrary view would be completely at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." 369 U.S. 95, 105, 82 S.Ct. 571, 577, 7 L.Ed.2d 593.

See also Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199; Northwest Airlines, Inc. v. Air Line Pilots Ass'n, 8 Cir., 442 F.2d 246, 249; Lodge 1327, International Association of Machinists & Aerospace Workers v. Fraser & Johnston Co., 9 Cir., 454 F.2d 88 (1971).

The Board in our present case relied upon the picket line clause and the bargaining history with respect thereto to support its conclusion that the no-strike, no-lockout clause did not cover the present controversy. The bargaining history has heretofore been set out. The picket line clause ultimately agreed upon was inserted in the contract after all other portions of the contract, including the no-strike clause, had been agreed upon. The picket line clause is clear and unambiguous. The Examiner in his report in effect so states, stating, "A careful consideration of this bargaining history regarding the picket line clause compels me to reach the same conclusion which I would reach independently of any bargaining history." We agree with the Examiner that the picket line clause is clearly unambiguous. We disagree, however, with his interpretation of the language. We do not believe that the picket line clause in any way modifies the obligations of the bargaining contract with respect to the no-strike clause or the duty to settle grievances through arbitration. We deem such provisions to be far more significant than the picket line clause. The picket line clause so far as here material waives only the right of the Company to discharge any employee for refusal to go through an authorized picket line of any union. It in no way modifies any right under the other provisions of the con-

tract to discipline an employee for disobeying a legitimate work order.

The Supreme Court in National Labor Relations Board v. Rockaway News Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832, deals with a strikingly similar problem. In that case, a truck driver employee had refused to cross a picket line established at the premises of a supplier of newspapers on his regular route by another union conducting an economic strike against the supplier. The collective bargaining agreement covering the driver provided:

"No strikes, lockouts or other cessation of work or interference therewith shall be ordered or sanctioned by any party hereto during the term hereof except as against a party failing to comply with a decision, award, or order of the Adjustment Board . . ." 345 U.S. 71, 79, 73 S.Ct. 519, 524, 97 L.Ed. 832.

In interpreting the no-strike clause, the Court looked to evidence regarding the bargaining history of a picket line clause proposed by the union and rejected by the employer, saying:

"If this [no-strike clause] be considered ambiguous in meaning, respondent offered, as evidence of its intent and meaning, to prove that during the negotiations one of the demands made by the union was a clause in the contract with reference to work stoppages which would have said 'No man shall be required by cross a picket line,' that this clause was rejected by respondent and the union acquiesced in the rejection and consented to the no-strike clause as above recited." 345 U.S. 71, 79–80, 73 S.Ct. 519, 524, 97 L.Ed. 832.

The Court went on to hold that in the light of this bargaining history, the no-strike clause clearly prohibited an employee's refusal to cross a picket line. Because the employee violated the no-strike clause, it was not an unfair labor practice for the employer to discharge him.

The no-strike clause in our present case contains no express language with respect to crossing picket lines. Such issue is appropriately answered in News Union of Baltimore v. National Labor Relations Board, 129 U.S.App.D.C. 272, 393 F.2d 673, where the court states:

"Elsewhere in the contract the grievance procedure set up is characterized as to be invoked with reference to 'differences in the interpretation and enforcement of the terms of this contract, including the question of whether * * * the disputed issue is covered by the terms of the agreement, and including the interpretation of all language contained in this contract.' Petitioners point out that there is no explicit reference to the crossing of picket lines and suggest initially that language which in terms inhibits only a strike is not to be read as restricting the observance of picket lines. But the practical relationship between work stoppages and the honoring of picket lines is so well understood in the industrial climate that we think that a clause of this kind using only the word 'strike' includes plant suspensions resulting from refusals to report for work across picket lines. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953)." 393 F.2d 673, 676–677.

In Atkinson v. Sinclair Refining Co., 370 U.S. 238, 246, 82 S.Ct. 1318, 1323, 8 L.Ed.2d 462, the Court states:

"It is universally accepted that the no-strike clause in a collective agreement at the very least establishes a rule of conduct or condition of employment the violation of which by employees justifies *discipline* or discharge." (Supporting citations omitted. Emphasis added.)

See National Labor Relations Board v. L. G. Everist, Inc., 8 Cir., 334 F.2d 312.

Article IV of the bargaining contract reserves the right of management to discipline employees subject to the full terms of the contract. We find nothing in the bargaining contract or the record to persuade us that the Union did not bargain away its right to refuse to cross a picket line to carry out a reasonable work order under the facts of this case.

**1094**

The work stoppage clause is broad. So are the provisions for compulsory arbitration. The benefits to be derived by employees by refusal to perform work orders across a picket line, such as here involved, are far less than the benefits to be derived from a strike concerning grievances against their own employer which situation is clearly covered by the no-strike clause.

There is no showing of Union animus on the part of the Company in disciplining the parties. The public interest in prompt performance of necessary work is recognized. The Company could not efficiently or economically carry out its recognized duty to the public if a work stoppage occurs every time a picket line is encountered where work is required. Under the bargaining contract, the employees' rights in the situation here presented are protected by the grievance and arbitration provisions of the contract.

The board erred in determining under the facts in this case that the Company had violated § 8(a)(1). The order of the Board is vacated and set aside. Enforcement is denied.